## THE STATE OF MINNESOTA *vs.* ANNE BILANSKY.

The plea of the benefit of clergy has never had any practical operation in the United States, and does not exist in any of the States as a common law right, and cannot be claimed in the absence of statutory provisions.

The Organic Act of the Territory of Minnesota, by Section Twelve, kept in force in the Territory the laws of the Territory of Wisconsin which were in force at the date of the admission of the State of Wisconsin; and by the laws of the Territory then in force, no distinction was made between murder and petit treason : all willful killing was murder, and punished by hanging. And the statute which divides homicides into various degrees of murder and manslaughter, makes no distinction in favor of, or against any class or sex of persons who shall offend against its provisions.

Where a provision in a chapter of statutes devoted to "general provisions concerning" a multitude of subjects, conflicts with one in a chapter devoted to a particular subject, the provisions of the latter shall prevail as to all matters and questions growing out of the subject matter of such chapter.

The provision of the Revised Statutes, on page 481, Sec. 72, which declares that a witness shall not be required to answer questions "which will have a tendency to accuse himself of any crime or misdemeanor, or expose him to any penalty or forfeiture," is but a declaration of the law of evidence as it previously existed, and neither enlarges or restricts the privileges of witnesses. The privilege pertains solely to the witness, and not to the Court. It is the duty of the Court to warn the witness of this privilege. If he indicate his desire to avail himself of the privilege, the Court may refuse to allow similar questions to be put to the witness; and if they are put without the interference of the Court, and are objected to by the opposing Counsel, the Court may rule them out without consulting the desire of the witness as to whether he will claim his privilege as to each question.

Where the question put to the witness has a tendency, not to criminate, but only to degrade or disgrace him, it rests under the sound discretion of the Court to allow or disallow it; and the exercise of that discretion will not be disturbed, except in cases of clear abuse.

In order to prove bias and prejudice in the mind of a witness against a prisoner, facts must be shown which directly tend to establish such feeling, such as threats, quarrels, and the like circumstances, and not merely such facts as, when proven, would leave the feeling inferential.

The section (222) of the Revised Statutes, page 564, providing that the Supreme Court shall "consider and decide the questions of law, and shall render judgment and award such sentence or make such order thereon as the law and justice shall require," is not peremptory; and said Court may remand the case to the District Court for such proceedings as to that Court may seem proper under the decision of the Supreme Court in the particular case.

The questions of law arising upon the trial of this cause being important and doubtful, in the opinion of the Judge before whom the same was tried in the Court below, he reported the case to the Supreme Court, under the provisions of *Chap.* 115, *p.* 778, *Stat. of Min.*

The following are the points and authorities relied on by Counsel for the Prosecution :

*First.*—In the rulings of the Court below, excepted to by Defendant's Counsel, upon questions propounded to the witness, Mrs. Fitzpatrick, upon her cross examination, no error was committed.

All the questions, in the exclusion of which the counsel

will insist there was error, might have elicited answers crimi-nating, or tending to criminate the witness. *See Secs.* 1 *and* 5, *Chapter* 107 *Rev. Stats., pages* 518 *and* 519.

The object of a portion of these questions was to degrade her moral character for the purpose of affecting her credibility, and the object of another portion the counsel *now* claims *may* have been to form a link in a chain of circumstances which *might* have been proven, showing or tending to show bias or prejudice in the mind of the witness towards the prisoner.

1. Criminating and degrading questions, which have for their *direct object* the degradation of the moral character of the witness, cannot be put, but even if it is not so, the exclu-sion of such questions, as well as of degrading questions, which are asked to show bias or prejudice, is, in the *discretion* of the Judge and the propriety of such exclusion cannot be reviewed by this Court.

(Authorities against the allowance of questions, having for their direct object the *degradation* of the witness' character.)

" It is a general rule " (says Mr. Hawkins evidently in ref-erence to questions having this object,) " that a witness shall not be asked any questions, the answering to which might oblige him to accuse himself of a crime ; and that his credit is to be impeached only by general accounts of his character and reputation, and not by proofs of particular crimes, whereof he never was convicted. 2 *Hawkins' Pleas of the Crown, page* 604, *Sec.* 101, *and numerous authorities there cited. For rea-sons pro and con, see Peake on Ev.* 129 *to* 138, *Rex vs. Lewis,* 4 *Espanasse* 225, *decided in* 1803.

In this case the witness who was a common informer and a man of suspicious character was asked whether he had not been in the house of correction, and Lord Ellenborough would not allow the question to be *put.*

*Rex vs. Saml Pitcher,* 1 *Carrington & Paine* 84, 1823.

In this case the Judge would not allow the prosecuting wit-ness on cross examination, (upon the trial of an indictment against a woman for the larceny of a watch) to be *asked* whether anything improper passed between him and the De-fendant at the house where the watch was stolen.

*Stuart vs. Russel*, 2 *Yeates (Penn.)* 334—1798.

In this case the Court held that the witness could not be *asked* whether he had not been committed to jail as an accomplice in swindling.

*Macbride vs. Macbride*, 4 *Espanasse* 242—1803.

It appears to be the opinion of the Reporters of the case of *Rex vs Saml Pitcher* (1 *Carrington & Payne* 84) as expressed in a note to that case, as a conclusion derived from a review of all the authorities upon this point that " in practice, the *asking* of questions to degrade the witness is regulated by the *discretion* of the learned Judge in each particular case." (This position taken by the Reporters is not disputed by Reports or Text books."

2. Authorities where the object is to affect the reliability of the witness by showing ill feeling or prejudice. *Peake on Evidence* 129 *to* 138.          ✦

*Macbride vs. Macbride*, 4 *Espanassee* 242, (*before referred to*)—1803.

In this case the witness for the Plaintiff was asked if she was not living in a state of concubinage with him, and the Court ruled the question out.

*Second.*—The statute provides and all the authorities agree that a witness may decline answering questions which criminate or tend to criminate, even when the answers might embrace matters material to the issue, and the witness having shown a disposition to exercise that privilege by declining to answer questions of a like nature it was the province of the Court to prevent a useless consumption of time, and the unnecessary harrassing of the feelings of the witness by a reiteration of similar questions. *See Revised Statutes, Sec.* 72, *p.* 481.

You cannot only, not compel a witness to answer questions which will criminate him, but that which tends to criminate him, and the reason is that the party would go on from one question to another, though no question might be asked the answer of which would directly criminate the witness, yet they would get enough from him whereon to found a charge.

*Rex vs. Slaney*, 8 *Carrington & Payne* 213; *Cowen & Hill's Notes to Phillips on Evidence, Part* 1, *p.* 736.

The witness in effect declined to answer these questions, especially the questions relative to her connection with Walker.

*Third.*—Admitting that the exclusion of questions criminating a witness as not within the discretion of a Judge, when their *object* is not to degrade the moral character, but to show prejudice or ill will on the part of the witness towards the party against whom he or she is testifying, as is insisted by Counsel for Defendant, and admitting further, that the witness in this case did not in effect exercise her privilege in refusing to answer all the questions relative to her connection with Walker, such questions were properly ruled out on other grounds.

1. Because the questions as to her criminal connection with Walker, previous to the marriage of the witness in December, were too remote to show the terms existing between them at the beginning of February, and the questions as to their relations after the marriage of the witness were sufficiently entered into. The contents of the letters shown to the witness, and the matters embraced in the offer of proof as to letters and presents would have been only cumulative. Besides these letters were properly ruled out as the Counsel for the Defendant should have exhibited these letters to the Prosecution before interrogating the witness in regard to them, and the offer to prove that letters of affection were written by the witness to Walker, was simply an offer to prove the same letters that the Court had just properly ruled out.

2. Because, the questions asked the witness in reference to her relations with Walker—if answered in the affirmative, and followed up by proof that the witness attributed the rupture of these relations to a third person, and that third person the prisoner—would have only furnished a *reason* for prejudice or ill will on the part of the witness towards the prisoner, and the first being the existence of a particular state of mind towards the prisoner, and not something which might produce it, the question was improper.

32

Evidence of this nature to prove the *existence* of a particular state of mind, is too remote to establish that, which might be shown in a much more easy and satisfactory manner. *See De Witt's Special Reports of the trial of Daniel E. Sickles for the shooting of Phillip Barton Key*, *p.* 49 *to* 51 *inclusive*.

2. Because, admitting that it is proper to show the state of mind of the witness by showing a *reason* for it, the question as to the relations of the witness being of no avail for that purpose, unless followed up by proof that she *attributed* the rupture of these relations to the Defendant and *prima facie* irrelevant, the Counsel for Defendant should have *offered* to prove such further fact in connection with the questions ruled out, when they were objected to, and shown their materiality, especially as the theory of the Counsel that Walker was Defendant's nephew, and the evidence of the friendly and intimate relations existing between the prisoner and the witness contradicted any such supposition.

"Where evidence is *prima facie* irrelevant, it is the duty of the party offering it to show its relevancy by connecting it with other facts which are proved, or by offering it in connection with other matters expected to be proved." *Milbury vs. Mobley*, 14 *Ala. Rep.*, *p.* 277 ; *Abney vs. Kingston*, 10 *do.*, *p.* 355.

*Second.*—The fact the evidence discloses as to the deceased being the husband of the Defendant at the time of the commission of the homicide does not vitiate the verdict.

No effect will be given by the Court to that portion of Sec. 14, Chap. 109, which provides that petit treason shall be prosecuted and punished as murder in the second degree—

1. Because there was no such offence as petit treason existing in this country at the time such section was passed, and therefore there is no such offence to punish. 1 *Russell on Crimes, page* 514, *note ; Wharton's Crim. Law, page* 73 ; *note to 1st Hale's Pleas of the Crown*, 378.

2. Because said section is inconsistent in this, that it *abolishes* the distinction between murder and petit treason, and then *makes a distinction*, and that in *favor* of the more

State of Minnesota *v.* Anne Bilansky.

aggravated offence, and as the Court cannot sustain both portions of the section, they should uphold that portion which is sensible, in preference to that portion which is ridiculous. The distinction between murder and petit treason was simply a distinction in the punishment; and it was not in fact that, as the sentence was seldom if ever carried out, but executed in the same manner as if it had been for murder. *See Hale's Pleas of the Crown*, 382. A person guilty of petit treason might be found guilty under an indictment for murder. 378 *idem*.

3. This provision is inconsistent with that provision of the statute which provides for the punishment of premeditated homicide, and the latter being in a chapter particularly devoted to that subject, and the former among miscellaneous provisions, the said latter provision must govern. *R. S., new ed., p.* 117, § 19.

The following are the points and authorities relied upon by the Counsel for the Prisoner:

*First.*—The verdict is against evidence, because it appears that the crime committed was "murder" in the second degree, or petit treason. *Vide Rev. Stat., p.* 523, *Sec.* 14; *Wharton's Law Dic., p.* 78.

The distinction between murder and petit treason has always been marked, and although the latter has been technically regarded as the graver offence, benefit of clergy has been allowed in such cases, although murder is among the offences which were not clergyable. Statutory enactments gave to females the benefit of clergy, *i. e.*, what was tantamount to exemption of the person from the extreme penalty.

We have no statute abolishing petit treason or benefit of clergy, unless the one referred to so does. If it is nugatory, then the indictment and conviction should have been for petit treason, in which event the extreme penalty could not be inflicted. 1 *Chitty's Crim. Law, p.* 544 *to* 563; *Wharton's Law Dic., p.* 788.

The obvious intention of the statute was to abolish the distinction which existed between murder and petit treason, to mitigate the grade of the latter, and to extend the humane

exemptions of the common law to offences of the grade committed by females.

*Second.*—The Court erred in sustaining objections to questions tending to degrade or criminate the witness Kirkpatrick. The principle deducible from the books is that it is the privilege of the witness and not of the party. *Vol.* 2, *Phil. on Ev., p.* 418 *to* 428; *People vs. Rector,* 19 *Wend., p.* 582; *Phil. on Ev., C. & H. notes, Part* 2, *p.* 740, 746, 749, 743; 1 *Greenleaf on Ev.,* § 460.

The rule is the same, whether the testimony may subject to punishment, and the only distinction is that when the evidence is *collateral,* and only tends to degrade, the authorities are contradictory as to the compulsory power of the Court to compel the answer, it being clear that when the evidence would subject to punishment, the Court will not compel. 1 *Greenleaf, Sec.* 451, *and above cited.*

*Third.*—The Court erred in sustaining objections to the testimony tending to show the relations between the witness and Walker, and in excluding testimony offered. *Phil. Ev., C. & H. notes, Part* 2, *pp.* 752, 757–8; 1 *Greenleaf's Ev., Sec.* 457, *&c.; Newton vs. Harris,* 2 *Selden* 345, *and cases; Stocks vs. People,* 5 *Denio,* 186, *and cases cited.*

I. V. D. HEARD, Prosecuting Attorney.

BRISBIN & BIGELOW, Counsel for Prisoner.

*By the Court*—FLANDRAU, J.   It is quite remarkable that a a Court in this country, at this day, should be called upon to investigate and decide questions of the benefit of clergy, and petit treason.   Yet the peculiar provisions of our statute render it necessary.   These subjects have so long been looked upon by lawyers and Courts as practically obsolete, that we enter upon an examination of them more in the spirit of curious research, than of useful application.   Yet as the case in which they arise is one of capital moment, the prisoner is entitled to any benefit that the statute may allow her, when construed, as such statutes must be, *in favorem vitæ.*

She was indicted for murder, and the evidence discloses that the murdered party was her husband. The statutes of this State, *R. S., page* 523, § 14, provide as follows:

" Sec. 14. The plea of benefit of clergy and the distinction between murder and petit treason are abolished, and the last named offence shall be prosecuted and punished as murder in the second degree." This was passed in 1851, and I will proceed to ascertain what was the law on these subjects at that time, to aid in determining how far the act is operative.

" The *privilegium clericale,* or the benefit of clergy, had its origin in the pious regard paid by christian princes to the church in its infant state; and the ill use which the popish ecclesiastics soon made of that pious regard." 4 *Black. Com.* 364. At first it was confined in its operation to those persons who were actually in the service of the church and had taken orders, but it was gradually extended until it comprehended all persons who could read, that being in those days of ignorance and superstition a mark of great learning, and the person enjoying this accomplishment was called a clerk, or *clericus.* The probable reason of this exemption being accorded to learned persons, was their supposed beneficial influence upon the progress of the realm in civilization and religion, as much as to any sanctity with which the persons of the clergy were invested. As might well have been expected, the privilege was soon perverted to the worst purposes, and the arrogance of the privileged class soon led them to claim what had its origin in a favor extended by the crown, to be theirs by a right of the highest nature, indefeasible, and *jure divino.*

This privilege was curtailed in England by legislation from time to time. By 4 *Henry* 7, *Ch.* 13, a distinction was made between laymen and clerks that were really in orders, subjecting the former to light punishment, and restricting the enjoyment of the clerical privilege to one offence. This distinction was abolished by the statutes of 28 *Henry* 8, *Chap.* 1, and 32 *Henry* 8, *Chap* 3, and restored again by 1 *Edward* 6, *Chap.* 12, which extended the privilege to lords of parliament and peers of the realm who could not read, and included in their behalf some crimes not clergyable at common law.

It subsequently, during the reigns of Elizabeth, James 1st, and William and Mary, underwent various mutations, affecting the punishment that might be inflicted upon laymen, women and peers who claimed its benefits. And in the reign of Queen Anne by Statute, 5 *Anne Ch.* 6, the qualification of learning was done away with altogether, and it was "granted to all those who were entitled to ask it, without requiring them to read by way of conditional merit," 4 *Black. Com.* 370, and the same statute allowed the Judge in his discretion to commit the prisoner to the house of correction or public workhouse for a period not exceeding two years. During the reigns of the first three Georges several changes were made in the punishment that might be inflicted upon laymen after the privilege had been claimed, such as "transportation to America," branding, labor, fine, &c. And in the reign of George the Fourth the absurd provision was abolished entirely. 7 *and* 8 *Geo.* 4 *Ch.* 28. *See Jacob's Law Dic. Vol.* 1, *page* 474 *et seq; Burrill's Law Dic., part* 1, *p.* 143; 4 *Black. Com. p.* 364 *Ch.* 28. So it seems that as the science of jurisprudence advanced, and it came to be understood that the possession of knowledge instead of being a reason for exculpating a criminal, tended rather to aggravate the offence, this privilege of Clergy was diminished from being a full acquittal of the offender to a mitigation merely of the punishment, and by this means what was originally an instrument of fraud upon society, was rendered a salutary check in administering the otherwise too rigorous criminal code of England, and when the punishment of crimes was made to correspond with, and depend more upon, the degree of their enormity, it was abrogated entirely.

While on this subject, it is curious to know how this plea was made and allowed, and I will refer to one case as an example. After the verdict was rendered of guilty, the prisoner was asked by the Court if he had anything to say why judgment should not pass against him. The prisoner then prayed his clergy, this was generally performed upon his bended knees. He was then tested by an ordinary who handed him a psalm to read, and he read the first verse. The Judge then put the question to the ordinary *"legit vel non,"* who answered *"legit."*

State of Minnesota v. Anne Bilansky.

The prisoner was then taken without the bar of the Court and branded in the hand. 1 *Salk.* 61. The Psalm usually given to the prisoner to read was the 51st, on account of the peculiar appropriateness of the first verse.

This Psalm is called in the vulgate the *Miserere*, hence termed the Psalm of mercy. *Burrill's Law Dic. part* 1, *p.* 143.

This plea has never had any practical operation in the United States, and had it, in the absence of any statutory provision, been claimed as a common law right in any State it would have been denied.

The crime of petit treason at the common law was involved in some uncertainty and comprehended numerous cases, 1 *Hale* 376, but by the 25*th Edward* 3, *Ch.* 2, they were reduced to three heads. 1. Where a servant killed his master. 2. Where a wife killed her husband. 3. Where an ecclesiastical person, secular or regular, killed his superior to whom he owed faith and obedience. 1 *Russell on Crimes, p.* 513, *note z;* 4 *Black. Com.* 203. This crime differed from murder only in the fact that it included the violation of that private allegiance which exists in the relations above enumerated, and which was looked upon as aggravating the degree of the offence, by making it treasonable in its nature. As the crime of murder was punished capitally, the distinction between it and petit treason, rendering the latter the more heinous offence could only be made in the manner of the punishment which was inflicted. The killing of a human being when accompanied by aggravating circumstances, such as the violation of the natural or civil relations existing between the murderer and his victim, was by the Roman law punished more severely than simple murder. For instance, the crime of *parricide* or the murder of one's parents or children was punished by scourging the parricide, and then sewing him up in a leathern sack with a live dog, a cock, a viper and an ape, and casting him into the sea. 4 *Black. Com.* 202. "And the Persians entertained the same idea, according to Heroditus, when they adjudged all persons when they killed their reputed parents to be bastards." *Ib.* The punishment of petit treason in

England in a man was to be drawn and hanged, and in a woman to be drawn and burnt. 4 *Black. Com.* 204. Such distinctions in crimes are not recognized in this country, and were not at the time the Statutes of 1851 were enacted. The Organic act of the Territory of Minnesota, by section twelve kept in force in the Territory the laws of the Territory of Wisconsin, which were in force " at the date of the admission of the State of Wisconsin," which occurred on the 29th day of May, 1848. *See U. S. Stats. at large, Vol. 9, page* 233. By the laws of the Territory then in force, no such distinctions existed, and all wilfull killing was murder and punished by hanging. *Statutes of Wis. Ter. of* 1839, *p.* 347, *Sec.* 1., *p.* 379, *Sec.* 9, *p.* 383, *Sec.* 13.

There was therefore nothing for the Statute of 1851 of Minnesota to operate upon; it abolished nothing for there was nothing to abolish, and the same paragraph by which it attempts to destroy this distinction between murder and petit treason, establishes a distinction in favor of the higher crime. Murder in the first degree is defined to be "The killing of a human being without authority of law, when perpetrated with a premeditated design to effect the death of a person killed, or any human being." *R. S. paye* 492, *Section* 1 *and* 2. This is general and covers all cases of such killing, and the grade or degree is characterized by the premeditated design to effect death unlawfully. The Statute divides homicides into various degrees of murder and manslaughter, but makes no distinction in favor of or against any class or sex of persons who shall offend against its provisions. It was strongly contended on the part of the prisoner that this section of the Statutes found on page 523 of the Revised Statutes, and which we have been discussing was intended to abolish capital punishment in cases of female offenders, and was passed in the Christian and philanthropic spirit of the age. The argument meets with several insuperable obstacles in the outset, which would prevent our conceding its force, however desirous we might be to lend our aid in mitigating the punishment in cases of female offenders. In the first place the legislature could not have had this object in view because the crime of petit treason was not confined to

women, but comprehended various offences committed by men, and it is unreasonable to suppose that while they were providing that the man who killed a stranger should suffer the extreme penalty, one who killed his master, thereby enhancing the degree of his guilt by violating his allegiance, should be punished simply by imprisonment. If the mitigation of the punishment of women had been the purpose and intent of the statute, the Legislature would have so stated, and excluded its operation from the case of those men whose offences would have been petit treason under the English law.

But there is a further reason why this statute cannot have the force given it which is contended for by the prisoner. The Revised Statutes contain a provision that when "the provisions of different chapters conflict with or contravene each other, the provisions of each chapter shall prevail as to all matters and questions growing out of the subject matter of such chapter." *R. S., page* 579, *Sec.* 12. The chapter on murder, which defines the crime carefully, fully brings the case of the prisoner within its provisions, and the chapter which contains a provision by which a distinction is sought to be made in her favor is devoted to "general provisions concerning crimes and punishments," and treats of a multitude of different subjects; where a provision in such a chapter conflicts with one in a chapter devoted to a particular subject the latter must prevail under the rule of construction above cited. We are clearly of the opinion that no force can be given to the provision contained in the Revised Statutes on the subject of petit treason for the reasons above given, and think the Court was right in holding that the crime was murder in the first degree.

The most important point in this examination arises on the ruling of the Judge upon the questions propounded by the counsel for the prisoner to the witness Kirkpatrick, on her cross-examination.

The provision of the *Revised Statutes, on page* 481, *Sec.* 72, which declares that a witness shall not be required to answer questions "which will have a tendency to accuse himself of any crime or misdemeanor, or expose him to any penalty or forfeiture," is but a declaration of the law of evidence as it pre-

viously existed, and neither enlarges or restricts the privileges of witnesses.

Fornication and adultery are made crimes by our statutes, *R. S., pp.* 518 *and* 519, and it may well be questioned whether the interrogations which were put to the witness did not tend to show an illicit intercourse between Walker and herself. They did not, it is true, go directly to that point, but affirmative answers to them would form important links in a chain of evidence to establish such an offence. It is objected that the privilege of declining to answer, is one solely appertaining to the witness, and not to the Court. This is true, yet it is the duty of the Court to inform the witness of the existence of this privilege, and after it has been claimed by the witness in an examination with sufficient clearness to indicate his design to avail himself of it, the Court has, from its general control over the conduct of the cause, the right to refuse to allow similar questions *to be put to the witness,* and if they are put without the interference of the Court, and objected to by the opposite counsel, the Court by the same power may rule them out, and is not obliged to go through the form of submitting the question to the witness in each case for his decision. It would be a useless consumption of time, and all such matters pertaining simply to the order of the trial, should, and do, lie in the sound discretion of the presiding Judge. The witness is not debarred from answering if he desires to change his mind, and can indicate his wish to the Court.

But suppose these questions had not a tendency to criminate, but only to degrade or disgrace the witness. Mr. Greenleaf, in his work on Evidence, *Section* 454 *of Vol.* 1, says: "On this point there has been a great diversity of opinion, and the law still remains not perfectly settled by authorities;" and in the course of his discussion of the question, cites numerous authorities, which from the very nature of the subject, and the various phases which it must assume in the thousand different cases where it is practically presented, leave it still in an unsettled condition, and preclude the possibility of any general rule ever obtaining which shall govern all cases. It is one of those questions which, to be decided correctly, must involve

the exercise of a large discretion by the Court in each particular case. It may be influenced very materially by the conduct of the witness on the stand, or the particular relation he may sustain to the parties or subject matter of the action, and these things can only be properly determined by the Judge who tries the cause.

An important distinction is made between questions of this nature, where the testimony sought to be elicited is relevant and material to the issue, and where it is collateral and asked only to cast discredit upon the witness, Mr. Greenleaf says, *Vol.* 1, *Sec.* 454: "In the former case there seems great absurdity in excluding the testimony of a witness merely because it will tend to degrade himself when others have a direct interest in that testimony, and it is essential to the establishment of their rights of property, of liberty, or even life, or to the course of public justice." In section 455 of the same volume the rule that where the question is collateral and irrelevant it should be excluded, is laid down, but the latter part of the same section very materially qualifies the doctrine, and shows that it may do injustice to exclude such questions although they may be purely collateral. He says, "There is certainly great force in the argument that where a man's liberty or his life depend upon the testimony of another, it is of infinite importance that those who are to decide upon that testimony should know to the greatest extent how far the witness is to be trusted. They cannot look into his breast to see what passes there, but must form their opinion upon the collateral indications of his good faith and sincerity. Whatever therefore, may materially assist them in this inquiry, is most essential to the investigation of truth, and it cannot but be material for the jury to understand the character of the witness whom they are called upon to believe, and to know whether, although he has not been convicted of any crime, he has not in some measure rendered himself less credible by his disgraceful conduct."

There is still a further subdivision of the question of testimony intended to disgrace a witness. Where the testimony *will not directly and certainly show his infamy, but only tend*

*to that end,* there it seems he may be compelled to answer. 1 *Greenleaf's Ev., Sec.* 456 ; 4 *Wend.* 232, 252, 254.

From a careful examination of the authorities that have been cited, and such others as I have had access to, I am quite clear that no absolute rule can be collected from them which will govern the admission or rejection of testimony of this character, and that the power over it must rest in the sound discretion of the Court, the exercise of which will not be disturbed except in cases of its clear abuse. This case does not disclose any abuse of the Court's discretion in excluding the testimony.

The Counsel for the prisoner on the argument in this Court, contended that a portion of the testimony sought to be elicited on the cross-examination of the witness Kirkpatrick, was designed to show a prejudice existing in the mind of the witness against the prisoner, and was admissible in that view. From the testimony alone, as offered, such a result was not apparent, and no offer was made on the trial to prove the facts which it would have been necessary to establish to give this force to the evidence, it being therefore *prima facie* irrelevant to the issue, the Court did not err in excluding it. A question can scarcely be conceived, which aided by a supposititious theory, cannot be made to have some material bearing upon a case, and all that would be necessary to obtain a new trial, would be to propound an irrelevant question, have it ruled out, and on a review, attach to it a theory which if proven would have made the testimony important. We would not be understood as intending to reflect at all upon the motives of the learned Counsel for the prisoner in offering this view of the case, but make the illustration only argumentatively. But if we should adopt the theory of the prisoner's Counsel, it would not show a *direct and actual* bias or prejudice in the witness against the prisoner, but only a *reason why* such bias or prejudice might exist, and from which it might be inferred. This is rather remote. To prove such a feeling of hostility in the mind of the witness, facts which directly tend to establish it should be resorted to, such as threats, quarrels, and the like circumstances, and not such as when

proven would leave the ill feeling inferential. It may be that the witness and the prisoner both sharing the affections of the same man, as the counsel contended he meant to prove, would be a strong case from which to infer an unfriendly feeling between them, but it is no stronger than the case upon which Judge Crawford ruled out testimony on the trial of Daniel E. Sickles for murder. It was there offered to show, to prove the insanity of the prisoner, that a communication was made to him by a party that his wife had been having illicit intercourse with the deceased. The Court thought it too remote to become a proper link in the chain of facts to establish insanity; it certainly would produce a great shock upon the mind of the husband, and *might* unsettle his reason, but such conditions of the mind must be established by evidence of acts such as usually characterize them and flow from them. *See De Witt's Special Report of the Case of Daniel E. Sickles, page* 49 *to* 51.

The prosecuting attorney desired this Court to pass sentence upon the prisoner in case of an affirmance of the order denying a new trial. *The R. S., page* 564, *Sec.* 222, provide that the Supreme Court shall "consider and decide the questions of law, and shall render judgment, and award such sentence, or make such order thereon as the law and justice shall require." It is not required peremptorily that we should pronounce sentence, and very properly so, because in many cases where the sentence is to be graduated by the enormity or aggravation of the offence, we would be wholly at a loss to determine to what extent justice required it should be inflicted, as only questions of law are brought before us. In this case the sentence can be but one penalty, yet as we are wholly unacquainted with the facts of the case, and the condition physically or morally of the prisoner, we prefer remanding the case to the District Court for sentence.

The order is affirmed, and the case remanded to the District Court of Ramsey county for such proceedings as to that Court may seem proper.