### S. L. BURNS v. STATE.

No. A-1433.    Opinion Filed January 25, 1913.

(129 Pac. 657.)

1.  **APPEAL AND ERROR—Record—Index.** A case-made or transcript of the record must contain a correct index, and, if lawyers are not more careful in this respect in the future, this court will be forced to adopt a rule to dismiss appeals, where such index is not incorporated in the case-made or transcript of the record.

2.  **TRIAL—Separation of Jurors..** (a) Under section 6851, Comp. Laws 1909, it is discretionary with the trial court to permit the jury to separate before the case is finally submitted to them.

    (b) For circumstances not requiring the reversal of a conviction because of the separation of the jury before the case was finally submitted to them, see opinion.

3.  **EVIDENCE — Acts and Declarations of Conspirators—Harmless Error.** (a) Declarations and conduct of a co-conspirator made and done after a conspiracy has terminated, and not in the presence of the defendant, are not admissible in evidence against him.

    (b) Where a conspiracy is entered into by two or more persons to do any unlawful act or to accomplish any unlawful purpose, the persons who engage therein are responsible for all that is said or done in pursuance of such conspiracy by any of their co-conspirators until the purpose for which the conspiracy was entered into has been fully accomplished.

    (c) The responsibility of co-conspirators for the language or conduct of those acting with them is not confined to the accomplishment of the common purpose for which the conspiracy was entered into, but extends to and includes all declarations made and collateral acts done incident to and growing out of the common design when spoken or done by a co-conspirator as against all of his co-conspirators.

    (b) For language and conduct of a former wife of a prosecuting witness which was admissible in evidence against a defendant who was on trial for assault with intent to kill, see opinion.

4.  **APPEAL AND ERROR—Review—Presumptions.** Unless the record affirmatively shows the absence of a defendant during his trial, the question that he was not present at such trial cannot be raised for the first time upon appeal.

5.  **SAME—Review—Harmless Error—Admission of Evidence.** In a prosecution for assault with intent to kill, any error in the admission of testimony of the prosecuting witness was not ground for reversal, where, on defendant's own testimony, the jury could not have done otherwise than convict him.

(Syllabus by the Court.)

*Appeal from District Court, Murray County;*
*R. McMillan, Judge.*

S. L. Burns was convicted of assault with intent to kill, and his punishment assessed at confinement in the penitentiary for five years, and he appeals. Affirmed.

L. H. Mayes testified for the state: That prior to March, 1910, he had resided with his wife, Fannie Mayes, at Hennepin, Garvin county, Okla. That they had two children, aged six and eight years, respectively, both of whom were girls. That prior to March, 1909, witness and his family had lived in the house of defendant at Hennepin. That defendant boarded with witness' family. That witness was a blacksmith by occupation, and was running a blacksmith shop in Hennepin. That in March, 1909, witness became satisfied that it was best for him to move his family out of the house of defendant. He therefore built a house of his own. That after witness moved out of the house of defendant, defendant was anxious to continue to board with witness, but witness did not want him about his home any longer. Witness' home was something like a quarter of a mile from the house of defendant. That on the 5th day of March, 1910, the wife of witness came to his shop and had a talk with him, and left the shop, and went to Mrs. Gibbert's, saying that she was going to take some garden seed to Mrs. Gibbert. After the wife of witness had left the shop about an hour and a half, defendant came running by the shop close to witness. At this time witness was working on a buggy which was sitting in front of the shop. Just before defendant passed the shop of witness, witness saw his wife going in the direction of the office of defendant. Witness

saw his wife go to Mrs. Stevens, and saw a little girl of Mr. Foster's come out and talk to his wife. They then walked off a ways, and the little girl went to the residence of defendant. Witness saw defendant get on his horse and start in a northwest direction, the same direction the wife of witness had gone, and go through a lane and turn into a gate into a field which his wife had entered. That they then went out of sight. That witness then started over there, but before doing so he borrowed a gun of a man named Jones. Witness then went in the direction which he had seen his wife and the defendant go. After witness had gone about a mile, he came to a creek, and, seeing that no horse had crossed there recently, he started back, and went up the bottom of the creek about 60 yards, and came to an open place, when the defendant shot at him. Witness did not see the defendant until he had fired two shots. The first shot hit witness in the hip. The result of this shot is that witness has been crippled ever since. After defendant had fired at witness, witness turned and looked in the direction from which the shots came. He then saw his wife going out from between two big logs where the defendant was. She had her clothes up on the right hand side. She was moving pretty fast. The smoke of the two shots enabled witness to locate the defendant. He was shooting from behind a log, and witness could only see his head and hands and his gun up over the log. That he was going by where his wife and the defendant were when the defendant first began shooting at him, and he would not have seen them had it not been for the shots fired by defendant. After witness saw the defendant he shot at him twice. Witness then went out to the edge of the bottom and met Mr. Wilbern and Mr. Higgins. About this time the defendant rode out of the bottom north of witness. The defendant was then about 60 yards from witness. Defendant pulled his pistol out from under his pants. Witness rode back down to where the shooting had taken place. He saw his wife there. She was looking around as though she was hunting for something. Witness had a life insurance policy in the Woodmen of the World for $1,000 payable to his wife. On Thursday evening before witness was shot on the following Saturday, when he

went back home, he found his wife lying across the bed. She called witness to her, and asked him if he had had his life insurance policy changed. He replied that he had not. She then requested witness to borrow a six-shooter, and let her have it and go with her over to Dr. Burns' office, saying she was going to kill the defendant. She said Dr. Burns had mistreated her, and she was going to kill him. Witness requested her to tell what Dr. Burns had done, that he would attend to him himself, but his wife insisted upon witness getting a gun and going with her to Dr. Burns' office, that she wanted to kill him herself, but she declined to tell witness how Dr. Burns had mistreated her or anything of the kind. When witness saw his wife down at the place where the shooting occurred, about 30 minutes after the shooting, she said to him, "Are you shot?" Witness replied, "I am," and turned around and showed her where he was shot. Witness said to her, "He missed his shot—he didn't hit me where he aimed to." She replied, "If we had got you to his office the other evening, we wouldn't have made any mistake." That his wife did not return home after the shooting. That on Tuesday morning before the shooting witness went to the stove in the kitchen, and found his wife with a pocketbook in her hand. This pocketbook contained three or four papers doubled up with medicine in them, and she told witness she was going to poison herself and the two children. She also told witness that, if there was ever any more trouble over Dr. Burns, she would kill herself and the children. She said it was strychnine. That she got it at a drug store. That a friend in town gave it to her. She afterwards admitted the medicine had been given to her by the defendant, but did not tell him for what purpose he had given it to her. Witness did not see his wife after the shooting until he saw her at court in Pauls Valley the following September, when a divorce suit between them was tried. That they were divorced. That witness had the children, and since the divorce his wife had married defendant.

Earl Higgins testified for the state: That he was acquainted with the defendant in 1910. That witness was looking for cattle in the bottom, and saw Mayes walking through the bottom

with a gun on his arm when the shooting occurred. That defendant fired the first shot. That defendant was located in a tree top. That the wife of Mayes was with defendant. That, when defendant shot at Mayes, Mrs. Mayes ran off a little piece. That the defendant fired three shots at the witness Mayes, and Mayes shot twice at the defendant. That the defendant then ran. That after the shooting was over Mayes went back down to the place where the shooting had occurred, and talked a little bit with his wife. Witness was present. Mrs. Mayes asked her husband if he was shot. He replied that he was, but that Burns had made a misshot. Mrs. Mayes then said: "If you had come to the office the other evening, he wouldn't have made any misshot." Mayes then told his wife not to come back home any more.

W. M. Jones testified for the state: That he was deputy sheriff of Garvin county. That he remembered the occasion of the shooting of Mayes by defendant. That witness arrested defendant for the shooting. That defendant said, "I hate to give up to you," but that he decided there had been enough shooting, and it was bad enough the way it was. Defendant asked witness if Mayes was shot. Witness replied that he was. Defendant asked if witness thought Mayes was going to die. Witness replied he did not think he would. That defendant said that, when he first saw witness Mayes, Mayes had his gun throwed up. That he, defendant, was too quick for him. That he shot, but really did not know who shot first. That he expected he got the first shot in. He did not know how many shots were fired by him, but that Mayes had shot three times. He said that Mayes' wife had a headache, and he had stopped to give her some headache tablets. Witness also testified that Mrs. Mayes was with defendant when he arrested him. That when arrested defendant had two Winchesters and a six-shooter.

Jonah Foster testified for the defendant: That he resided at Hennepin and had lived there for a number of years. That he was now serving a jail sentence for violating the prohibitory liquor law. That he was acquainted with the defendant and knows Bob Mayes. That witness heard Bob Mayes say once he was going to kill Dr. Burns. That witness communicated this

threat to the defendant. On cross-examination this witness testified that he did not have any regular occupation; that Bob Mayes had been the means of witness' prosecution for violating the prohibitory liquor law.

Charles Burns testified: That he was a brother of defendant. That on Wednesday following the shooting he visited the place where the shooting occurred. Witness described the scene of the shooting, but did not testify to any fact which materially affects this case.

William Springer testified for appellant: That he was a farmer by occupation. That he was acquainted with defendant. That he knows Bob Mayes. That some time in 1909 Bob Mayes had a conversation with witness about defendant. He said at one time he came very near killing Dr. Burns over his wife, but he investigated and found there were false reports on them. That witness communicated these statements to the defendant.

M. W. Jackson testified for appellant: That he was a farmer by occupation. Witness heard the witness Mayes make the same statement as testified to by the witness Springer.

W. M. Lindseysmith testified for appellant that he lived near Hennepin; that he was acquainted with the defendant; that the defendant went to his house on the morning of the trouble to see a sick child.

A. L. Napier testified for appellant: That he was a miner by occupation. That he was acquainted with the defendant and knew Bob Mayes. That some time before the shooting he heard some parties brand Mayes as a coward for not killing Dr. Burns. Witness informed defendant of this.

Sam Carnes testified for appellant: That he carried the United States mails from Davis to Homer; that witness had heard of trouble between Bob Mayes and Dr. Burns.

J. H. Pearson testified for appellant: That he heard about the shooting between Bob Mayes and defendant. That he saw defendant after the shooting was over. He was on horesback and going in a trot. He saw Bob Mayes crossing the field before the shooting. Mayes was running and had a long gun with him. That in five minutes afterwards witness heard the shooting.

Jack Wilbern testified for appellant: That he was a cattle dealer. That he knew both the defendant and Bob Mayes. That he had seen the place where the shooting occurred. That he heard the shots fired. Witness described the place of the shooting. Witness saw Bob Mayes and Higgins with Mrs. Mayes shortly after the shooting, but did not hear what passed between them.

J. C. Potts testified for the defendant: That some time prior to the shooting he had a conversation with Bob Mayes about the defendant. He heard Bob Mayes say that defendant had done him an injury, and that he had once carried him off to kill him. That witness informed defendant of what Bob Mayes had said.

Will Lanham testified for defendant: That he was a stock-raiser, remembers the shooting between Bob Mayes. and the defendant. That witness heard the shooting. That he was some 400 or 500 yards off. That witness went in the direction of the shooting and saw Bob Mayes.

Mary Walker testified for the defendant: That she remembers the trouble between Bob Mayes and the defendant. She heard the shooting. That she was a Chickasaw freedman. That she saw Bob Mayes go off into the timber, and in a few minutes she heard the shooting. That soon after the shooting she saw the defendant traveling pretty fast on horseback going from the place where the shooting occurred.

Appellant testified in his own behalf: That he was 35 years of age and a physician. That he resided at Hennepin. That some time in 1908 Bob Mayes and his family rented the house of appellant, and appellant boarded with him. That this continued until May, 1909. That defendant's relations with Mr. and Mrs. Mayes were pleasant. That at one time Bob Mayes had charged defendant with being in bed with his wife. That after Mayes had had a house of his own built Bob Mayes requested defendant to come to his house. That defendant did so, and Mayes told the defendant he had been informed that he was criminally intimate with his wife, and defendant denied it, and told him there was nothing to it. That defendant was frequently warned to be on his guard against Bob Mayes, as Bob would kill him about his

wife. That on the morning of the difficulty witness left town, taking with him his medicine case and pistol. That his purpose was to visit a patient. That he had not seen Mrs. Mayes that morning. Witness was on horseback. That, when he came to the place where the shooting occurred, he saw Mrs. Mayes. She was standing near a tree top, Mrs. Mayes called to defendant, and he rode to where she was. She asked him for some headache tablets. Witness took his saddlebags out, and placed the medicine in an envelope. Witness was sitting on a log and Mrs. Mayes was standing by him. She sat down on a limb about twelve inches from the ground. The defendant and Mrs. Mayes were together about five minutes. Witness then testified as follows:

"Q. Tell the conversation that you had with her? A. Well, she told me that she wanted the headache tablets. While I got them out, I says, 'What are you doing over here?' And she says, 'I came over to Gibbert's to plant some garden.' And I says, 'What do you want to plant with him for? He never raised enough for them;' and she said, 'Bob said he never did see any one raise cabbage and tomatoes like he did.' I says, 'What was Bob mad about this morning?' And she says, 'He was in the best of humor when he sent me over here.' And I says, 'He was awfully mad when I saw him,' and I told her I was going to Lindsey-smith's, and I says, 'I have got to hurry;' and about that time she looked over her shoulder. She was facing a little bit south of west, facing me, and she looked over her shoulder and said, 'My God, there is Bob Mayes with a gun.' And she jumped up. Q. How was you facing at that time? A. I was facing north. Q. Like this was the tree? You was on the north side and she was here? A. Yes, sir. Q. Which way did she look? A. She looked over her left shoulder. Q. What direction? A. Looked south. Q. What was it she said? A. She says, 'My God, there is Bob Mayes with a gun,' and I says, 'Get out of the way.' And I pushed my saddlebag off with one hand and whirled around. I couldn't say which way I turned, but as I turned I drew my gun, and I was shooting in this position. The log was about my head. Q. As soon as you got in position to shoot with your pistol, what did you see? A. As soon as she said that, I looked over my shoulder, and I saw him with his gun raised, pointed our way. Q. Show us how he had the gun? A. It was this way; about like that. Q. And what did you do? A. I drew my gun and began firing. Q. How quickly? A. As quickly as I could. Q. Why did

you shoot? A. Because I thought my life was in danger. Q. Did he shoot? A. He did. Q. Who shot first? A. I couldn't say. The shots were too near together. Q. How many times did you shoot? A. I shot three times. Q. Who did you shoot at? A. I shot at L. H. Mayes. Q. Did you know at that time whether you hit him or not? A. I did not. Q. Did he make any outcry or say anything? A. No, sir. Q. How many shots did he shoot at you? A. He shot two shots at me and one at his wife."

Appellant testified on cross-examination that after the difficulty between Mr. and Mrs. Mayes he had married Mrs. Mayes, and she was now his wife. The above is a fair abstract of the material portions of the testimony in the case.

*E. G. Mitchell* and *Carr & Field,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen. (*J. S. Estes,* of counsel), for the State.

FURMAN, J. (after stating the facts as above). First. The transcript of the record in this case contains about 300 pages, yet there is no index attached to it. It is the duty of counsel for an appellant to see that a correct and complete index is attached to every transcript of the record or case-made. The court is already flooded with work, and it is the duty of counsel in preparing their records and briefs to so arrange them that the court can without delay turn to the page of the transcript upon which counsel relies in support of an assignment of error. The names of all of the witnesses and the pages upon which their testimony appears, and of every material step in the case, should appear in this index. If the lawyers of this state do not take more care in this matter, we will be compelled to make a rule dismissing appeals where the transcript of the record is not properly prepared.

Second. The third ground relied upon in support of a motion for a new trial is as follows:

"That there was misconduct on the part of the jury after the same was duly impaneled and sworn to try the case, and by reason of this alleged misconduct a fair and due consideration and impartial verdict in said cause was prevented; said misconduct consisting of the permitting a number of the jurors on said panel to separate from the rest of the panel, and to absent themselves from the room in which the said jury was supposed to be kept by the bailiff, and also in the bailiff permitting a number of said

jurors after said jury was impaneled to try said cause, in conversing and talking with various persons outside of the hearing of said bailiff, and outside of the room in which said jury was supposed to be kept, all of which was prejudicial to the rights of the defendant, and prevented a fair and impartial consideration of said cause, as provided by law. In support of said misconduct of said jury said defendant hereto attaches the affidavit of Chas. E. Burns, duly subscribed and sworn to."

The ground for a new trial is supported by the affidavit of Chas. E. Burns, to the effect that on Friday and Saturday, the 14th and 15th days of April, 1911, when this trial was in progress, affiant was registered and stopping at the Holland Hotel in the town of Sulphur; that on Friday evening a jury of twelve men in charge of a bailiff came to said hotel, and were taken to the hotel office in the front part of said building, at the north end of said hall, in a room opening into said hall; that the bailiff in charge of said jury permitted said jurors to converse indiscriminately with various persons in and about said hotel office, and to get out of his hearing, and to separate from the remainder of said jury in said hotel office, and to wander down the hall to the wash-basin, and to the small toilet room at the north end of the hall, and remain out of the hearing of said bailiff and various places along said hall for some ten or fiften minutes before they were taken into the dining room for their supper; that after supper a number of said jurors used the telephone and talked to persons whose names were unknown to affiant. The record in this case shows that the trial began on Friday, the 14th day of April, 1911. The instructions to the jury were filed on Monday, the 17th. The instructions must be read to the jury before the case could be submitted to them. It therefore affirmatively appears from the record that the matters complained of occurred prior to the submission of the case to the jury. In the cases cited by appellant, decided by this court where reversals were entered because of the separation of the jury, the matters complained of all occurred after the case had been submitted to the jury, and they had begun their deliberations. Where the separation of a jury takes place prior to the submission of a case to the jury, an entirely different question is presented.

This matter was discussed fully in the case of *Armstrong v. State,* 2 Okla. Cr. 567, 103 Pac. 658, 24 L. R. A. (N. S.) 776, by Judge Doyle, and the question now presented was decided contrary to the contention of appellant. In that case this court said:

"It is not claimed in the case at bar that there was a separation of the jurors after the final submission of the cause or after the jury retired to consider their verdict. The question in this case requires only a construction of section 5512, Wilson's Rev. & Ann. St. 1903, which provides: 'The jurors sworn to try an indictment, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so themselves on any subject connected with the trial, and to return them into the court at the next meeting thereof.' Under this provision the segregation of the jury in felony cases, before the cause is finally submitted, is left to the discretion of the trial court, yet we believe that in the exercise of sound judicial discretion the trial court in a capital case should not refuse a request from either party to place the jury in charge of sworn officers during the progress of the trial. The legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that, during the adjournment of a trial, the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby. Construing a statute identical in its language, the Supreme Court of California in the case of *People v. Chaves,* 122 Cal. 134, 54 Pac. 596, says: 'While the jury was being impaneled, and during the progress of the trial, the court took a recess several times, and at each of such times after properly admonishing the jurors, permitted them to separate, without the consent of defendant or his counsel. No objection to the separation was made; but it is now claimed for appellant that it was error for the court to permit the jurors to separate, and that section 1121 of the Penal Code, which authorized the court in its discretion to permit the separations, is unconstitutional because it is inconsistent with that provision of the Constitution which declares that: "The right of a trial by jury shall be secured to all, and remain inviolate." Article 1, par. 7. The section of the Code referred to is not unconstitutional. It in no way violates or in-

terferes with the right that every one has to a fair trial by jury. The matter rested in the discretion of the court, and, as no abuse of that discretion appears, its action was justified and proper.' The Supreme Court of Arkansas, in a capital case (*Hamilton v. State,* 62 Ark. 543, 36 S. W. 1054), said: 'It is said that the court, against the objection of the defendant, permitted the jurors to separate before the case was finally submitted to them. This also was a matter within the discretion of the court. San. & H. Dig. par. 2236. But in *Johnson v. State,* 32 Ark. 309, it was remarked by this court that "such discretion should be exercised, especially in trials for felony, with the utmost caution." The great interest usually taken by the public in trials for offenses punishable by death, and the danger that either the state or defendant may suffer prejudice from such separation of the jurors, make it, in our opinion, rarely prudent for a court to permit such separation in trials for capital offenses, when either the counsel for the state or defendant objects. It is not always easy in such a case to ascertain the influences to which a separation has subjected the jurors. For this reason, as the defendant objected to the separation of the jurors, we believe that it would have been better to have kept them together; but as the statute leaves this matter to the discretion of the circuit court, and as there is nothing to show that the defendant was prejudiced by the separation, the exception must be overruled, and a new trial on that ground refused.' The Supreme Court of Oregon, in the case of *State v. Shaffer,* 23 Ore. 557, 32 Pac. 546, said: 'The next objection is that the court allowed the jury to separate during the trial of the defendant. This is a matter within the discretion of the court, who may permit the jury to separate pending the trial upon properly admonishing them touching their duties. It is expressly provided by our Code that the jury may be kept together, in charge of a proper officer, or may, in the discretion of the court, at any time before the submission of the cause to them, be permitted to separate; but in either case they may be admonished by the court that it is their duty not to converse with any other person, or among themselves, on any subject connected with the trial, or to express any opinion therein until the case is finally submitted to them. Section 198, Hill's Code; *Stephens v. People,* 19 N. Y. 549.' The Supreme Court of Kansas, in the case of *State v. Hendricks,* 32 Kan. 559, 4 Pac. 1050, said: 'No error was committed by the court in permitting the jury to separate. The court in a criminal prosecution for murder in the first degree, as well as in other cases, may permit a separation of the jury after instructions are given, and before the arguments of coun-

sel are fully completed, and, indeed, at any time before the jury are allowed to retire under the charge of their bailiff for final deliberation upon their verdict.' The Supreme Court of Minnesota, in the case of *State v. Nelson,* 91 Minn. 143, 97 N. W. 652, said: 'At the opening of the trial defendants requested, in view of the alleged public feeling at Owatonna, the place of holding the trial, that the jury be kept in charge of the sheriff, and not permitted to separate. The court denied the request, and this order, also, is assigned as error. The question has frequently been before us and we have uniformly held that it is a matter purely discretionary with the trial court whether to confine the jury or permit them to separate during the trial. No reason is presented in the record in this case to justify us in holding that the court abused its discretion. *State v. Bilansky,* 3 Minn. 246 (Gil. 169) ; *State v. Ryan,* 13 Minn. 370 (Gil. 343).' The rule to be deduced from these cases is that, where a statute in plain and unambiguous terms confers a discretionary power upon the court as to whether or not the jury shall be permitted to separate during the trial of a capital case, the fact that the court permitted the jury to separate, without objection on the part of the defendant, is not ground for a new trial. An appellate court is authorized to say that the trial court erred in a matter of this kind only when it affirmatively appears from the record that there was such an abuse of discretion as denied the defendant a fair and impartial trial; but where the defendant by affirmative proof shows that, by reason of such separation of the jury, his substantial rights were prejudiced, a new trial should be granted. This provision of our statute is an ample safeguard over the purity of jury trials. The clear intention of the lawmaking power is that the mere separation of the jury during the numerous and necessary adjournments incidental to a criminal trial should not result in delaying or defeating the ends of justice, when there is not the slightest presumption or probability or even possibility of injustice to the defendant. In this case, when viewed in the light of the record, the criticism of the counsel for defendant has no merit. It clearly appears that the defendant suffered no injury by reason of the separation of the jury. While we must at all times guard the rights of the accused, we must not be so technical in procedure as to set aside fair and impartial trials upon mere shadows, thus bringing the administration of criminal justice into endless delay and public derision."

We think that Armstrong's case is decisive of this question. We therefore hold that the matters stated in the motion for a

new trial and in the supporting affidavit with reference to the separation of the jury did not constitute any legal ground for setting aside the verdict.

Third. The next assignment of error relied upon by counsel for appellant is as follows:

"Error of the court in permitting the testimony of the prosecuting witness concerning conversations between him and his wife, Fannie Mayes, in the absence of the defendant, and in permitting the state to show a number of transactions long after the alleged assault, including the arrest of the defendant in Pauls Valley more than six months after the shooting for the crime of adultery, all of which testimony was highly prejudicial to the defendant."

There are two views to take of this case. Concede for the sake of argument that the trial court erred in admitting the testimony complained of, was this error of such a character that it would necessarily result in a reversal of this conviction? We think not. Why? Because upon appellant's own testimony an honest and intelligent jury, having a due regard for their oaths, could not have done otherwise than convict him. In the light of the admitted facts of this case appellant had deprived himself of the right of self-defense. It was an insult to the intelligence of the jury to ask them to believe that appellant and Mrs. Mayes met by chance on the morning of the difficulty, and the appellant's only purpose was to administer to her some tablets to relieve her headache, and that he was engaged in this commendable enterprise at the time when he was surprised by Bob Mayes. Doctors do not administer headache tablets to their female patients lying down with them in the woods between two logs. If they had been sitting up, as appellant first testified, they would have been seen by Bob Mayes, and would have seen him before the shooting began, and appellant would not have been lying behind the log when the first shot was fired. Appellant in describing the fight said: "As I turned I drew my gun, and I was shooting in this position, the log was about my head." If appellant was not lying behind that log with Mrs. Mayes, what was he lying there for, and how did it happen that the log was about his head? His testimony on this subject is a libel on common sense and human nature. It is absolutely plain that appellant was engaged in an

unlawful invasion of the marital rights of Bob Mayes. Appellant was armed with a pistol. According to the witness Higgins appellant fired the first shot. This appellant does not deny. If appellant was sitting on the log, as he first claimed, with his medicine case in his hands, and his back toward the witness Mayes, and Mayes was coming toward him with a gun in his hands, how was it possible for appellant to dispose of his medicine case, draw his pistol, lie down behind the log, and fire the first shot? No impartial, sane, and honest jury could ever be induced to believe such a statement as this. The plain and simple truth is that, being interrupted in the commission of an unlawful act by one who had the right to make such interruption, appellant began the fight, and fired the first shot. He could not under any view of the case claim that he shot in self-defense. He could not have been injured by the testimony complained of, for it was clearly the duty of the jury to convict him without regard to such testimony. His own testimony amounted to a plea of guilty. Even if it be conceded that the trial court did err in admitting the evidence complained of, the error was immaterial and harmless. This case illustrates the debasing and depraving effect of illicit love. Both sacred and profane history furnish many examples showing that illicit love is a most powerful motive for, and fruitful source of assassination. The blackest pages in English history grew out of the illicit loves of Henry the Eighth. The case of David and Uriah's wife shows to what treachery and degradations illicit love will reduce those who permit it to find lodgment in their hearts, and to pollute their lives. Pure love is the cause of all self-sacrifice, and the mainspring of all that is noble among the achievements of men. It is like fire taken from off the altar of Heaven. It purifies, enobles, and lifts men up, and makes them nearer to and more like their God. It is indeed the emotion that sums all bliss; the springhead of all felicity; the silken down of happiness complete; the sparkling cream of all times blessedness; the center to which all human beings gravitate; the emblem of God.

It has been well said:

"Who happy and not eloquent of love?
Who pure and as it is true,
Not a temple where its glory ever dwells,
Where burn its fires and beams its perfect eye?"

Illicit love is exactly the reverse of all this. The imagination cannot conceive and language cannot describe the blackness and despair, the degradation, shame, misery, suffering, and woe which it brings to the innocent as well as to the guilty. It is like fire taken from the very furnace of hell. It burns up, consumes, and destroys all that is pure and noble in the hearts of men and women. It sinks them beneath the level of brutes. It involves them in unutterable infamy in this world, and prepares them only for perdition in the life beyond the grave. When we reflect upon the cause which prompted appellant to attempt to assassinate Bob Mayes, we find that his conduct is in strict harmony with the motive from which it sprang. It is the duty of this court to decide all questions submitted to it in the light of the moral atmosphere in which they are surrounded, and never to permit the law to become a cloak of protection for men who trample upon the sacred rights of others, and bid open defiance to decency and the best interests of society.

We will now take another view of this matter. When the case was submitted, the introduction of this evidence was the principle question discussed, and able and eloquent arguments were made in behalf of appellant. The evidence complained of was admitted by the trial court upon the theory that a conspiracy existed between the appellant and Mrs. Mayes, and that the testimony objected to all related to what occurred in pursuance of this conspiracy. We agree to the proposition that declarations and conduct of a co-conspirator made and done after a conspiracy has terminated and not in the presence of a defendant are not admissible as evidence against him. See *Wells v. State,* 5 Okla. Cr. 22, 113 Pac. 210. But the law is equally well settled that, where a conspiracy is entered into by two or more persons to do any unlawful act or accomplish any unlawful purpose, the persons who engage therein are responsible for all that is said or done in pursuance of such conspiracy by any of their co-conspirators until the purpose for which the conspiracy was entered into have been fully accomplished, and that the responsibility of co-

conspirators is not confined to the accomplishment of the common purpose for which a conspiracy is entered into, but extends to and includes all declarations made and collateral acts done incident to and growing out of the common design, when spoken or done by a co-conspirator as against all of his co-conspirators. For a full discussion of this question and citation of authorities, see *James Holmes v. State*, 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300.

It cannot be denied that the testimony in this case shows that improper relations existed between appellant and the wife of Bob Mayes, and that they were colluding and conspiring together for the purpose of having illicit sexual intercourse with each other, and that the shooting for which appellant has been convicted was a mere incident to this conspiracy, which was not fully consummated until after Mrs. Mayes and Bob Mayes were divorced and appellant had married the former wife of Bob Mayes. This being true, everything said or done by Mrs. Mayes, whether in the presence of appellant or not, prior to the consummation of this conspiracy and in pursuance thereof, which throws any light upon this transaction, is just as binding upon appellant as if said or done by him. If a white-winged angel had come down from Heaven and testified against appellant, it could not have been more conclusively established than appears from this record that appellant is guilty of a double crime. He not only tried to assassinate a human being, but by debauching Mrs. Mayes he robbed Bob Mayes of his wife, and worse than orphaned two little innocent girls, and thereby wrecked and ruined the respectability, peace, and happiness of a home. A country is nothing except an aggregation of homes. No country can rise superior to the standard of its homes, and no home can exist without the absolute purity of the wife and mother. Our wasted fortunes may be restored, our burned houses may be rebuilt, but who can repair the moral desolation of a ruined home caused by the debauchery of a wife and mother? What greater crime could be committed, not only against Bob Mayes, but also against society? Eternity alone will be able to reveal the enormity and far-reaching results of this crime. The conduct of which appellant has been found guilty

should not for one moment be condoned by any court or jury, and a conviction in such a case, when supported by the evidence, as is done in this case, should not be set aside except for the most grave and serious reasons. This is not a case of harmless error, but it is a case where no error at all was committed, and the action of the trial court in receiving the evidence complained of is commended and sustained.

Fourth. Counsel for appellant contend in their brief and oral argument that the judgment should be set aside because the records of the court do not affirmatively show the presence of the defendant during the trial. The record does show that the defendant entered a plea of not guilty; that he was present when the state's witnesses were examined; that he testified in' his own behalf, and was present when the sentence of the court was pronounced. It affirmatively appears from the motion for a new trial that appellant was present during the trial of this case, and that he requested the court to send the jury to inspect the place where the shooting occurred, and that he took numerous exceptions to the introduction of evidence and the instructions of the court as given to the jury. Upon the authority of *Sam Wood v. State,* 4 Okla. Cr. 436, 112 Pac. 11, this record would sustain this conviction, even though it should be held that the record must affirmatively show the presence of the defendant during his trial. To hold that this case should be reversed on account of the question now raised would be a very severe reflection upon counsel for appellant. It would be based upon the presumption that they were so negligent or so ignorant as to allow their client to be tried for a felony during his absence. We cannot presume anything of the kind, because this court has actual knowledge of the fact that counsel for appellant are among the ablest and most zealous lawyers in the state, and that they have taken care of every right of their client. If appellant was not present during the trial in the court below, why was this objection not presented then? Why was it not embodied in the motion for a new trial, and why, when the appellant was called upon to state his reasons, if any he had, why sentence should not be pronounced upon him, was the objection not made that the trial had taken place during

his absence? Every presumption of law must be indulged in favor of the regularity of proceedings of a court of record and of the ability and fidelity of counsel for a defendant in the failure of the record to affirmatively show the absence of appellant. We therefore cannot assume, as counsel now claim we should do, that appellant was not present during his trial. Of course, if the record affirmatively showed that he was not present during the trial, we would be forced to set aside this judgment, but there is nothing in the record upon which such a presumption can be based. Since the decision in the Sam Wood case we have investigated this question more fully, and we are now satisfied that an appellant should not be heard to complain for the first time in this court that he was not present during the trial of his case in the lower court, unless this fact affirmatively appears from the record. We fully indorse the views expressed by the Supreme Court of Nebraska in *Dodge v. People,* 4 Neb. 220. That court said:

"It is claimed that the record does not show that the prisoner was present in court during the trial, nor at the time sentence was pronounced. It appears from the record that the prisoner was duly arraigned and pleaded not guilty, that he was present during the time the jury were being impaneled, that after the evidence was closed he filed instructions with the clerk and excepted to the instructions given by the court on its own motion, but the record is silent as to whether the prisoner was present in court or not at the time the jury returned their verdict. The rule is well settled that in all cases of felony the prisoner must be present in court during the trial, and at the time the verdict is received, and no valid judgment can be predicated on a verdict received in the absence of the prisoner. At common law the finding of the jury of the guilt of the accused was conclusive of that fact, and the court possessed no power to set the verdict aside and grant a new trial on the merits on the motion of the accused, even where the verdict was clearly against the weight of the evidence. Hilliard on New Trials, 114; *Queen v. Bertrand,* 1 P. C. 520; *The King v. Fowler,* 4 Bran. & Ald. 275; 1 Ch., C. L., 653. Neither was prisoner allowed a counsel upon his trial on the general issue in any capital crime, unless some point of law arose proper to be discussed. 4 Blackstone, Com. 355. To guard against this provision of the common law, the Constitution of the United States provides that in all criminal prosecutions the ac-

cused shall have the assistance of counsel for his defense. Nor must it be forgotten that among the variety of actions that men are liable to commit 160 were declared to be felonies without benefit of clergy, the punishment of which was death. 4 Blackstone, 19. Therefore the utmost caution was required in capital trials in favor of life, and, if an irregularity materially affecting the trial occurred to the injury of the accused, the court usually represented such matter to the crown, and a pardon was granted. *Commonwealth v. Green,* 17 Mass. 534. Now, however, in the court of Queen's Bench, when the record is before that court and it appears that evidence has been improperly admitted, or the jury have been misdirected, a new trial may be granted in cases of felony (*Rex v. Scaife,* 2 Don., C. C., 281; 17 Q. B., 238), and a person accused of crime is allowed the assistance of counsel to conduct his defense. In this country the almost uniform practice has been to extend to criminal cases, so far as the revision of verdicts is concerned, substantially the same principles which have been established in civil cases; and by statute in this state, after a verdict of guilty, a defendant may move for a new trial on any or all of the grounds therein set forth. And it is his duty, in such a case, to bring before the court by his motion all the reasons which are known to exist for setting aside the verdict, and granting a new trial. There is no reason why the same rule in that respect should not apply in criminal as in civil cases. In this case, in the 23 grounds assigned in the motion for a new trial there is no allegation that the prisoner was not present in court. The only irregularity complained of in the proceedings of the court is in overruling the motion of the prisoner to quash the indictment. The presumption is that the court performed its duty, and that the prisoner was in court at the time the verdict of the jury was received. In the case of *Beale v. Commonwealth,* 25 Pa. 18, the court held: 'We are not to expect too much from the record of judicial proceedings. They are memorials of the judgments and decrees of the judges, and contain a general but not a particular detail of all that occurs before them. If we must insist on finding every fact fully recorded before a citizen can be punished for an offense against the laws, we should destroy public justice, and give unbridled license to crime. Much must be left to the intendment and presumption, for it is often less difficult to do things correctly than to describe them correctly.' And in *Rhodes v. State,* 23 Ind. 24, the court held: 'In this case the prisoner is shown by the record to have been present in court at the commencement of the trial. The record is silent as to

where he was at the return of the verdict. We presume he was in court.' See, also, *Brown v. State,* 13 Ark. 100."

The same doctrine was announced in the case of *Folden v. State,* 13 Neb. 332, 14 N. W. 414, as follows:

"And, lastly, it is urged that the record fails to show affirmatively that the prisoner was present in court when the jury brought in their verdict. This point was not made in the motion for a new trial, and therefore, even if it could otherwise be regarded as fatal to the judgment, it is too late to raise it now. *Dodge v. People,* 4 Neb. 220. The record, however, does show that the prisoner was duly arraigned, and pleaded to the indictment; that he was present at the impaneling of the jury who tried him, and gave his own testimony as a witness before them. With these facts it would be altogether unreasonable to presume from the mere silence of the record on that point that he was absent when the verdict was received by the court. When the record once shows the presence of the prisoner at his trial, it will be presumed to have continued to the end, unless the contrary is affirmatively shown. The presumption is, rather, that the trial court did its duty than that it did not. We see no error in the record that calls for a new trial, and the judgment must be affirmed."

We could fill a volume in citing cases of other courts to the same effect, but these opinions are based upon reason and justice, and therefore further discussion is unnecessary.

So far as the case of *Humphrey v. State,* 3 Okla. Cr. 504, 106 Pac. 978, 139 Am. St. Rep. 972, is in conflict with the views herein expressed, that case is modified and overruled.

We admire the zeal and ability with which counsel for appellant have presented his case in this court. They have certainly done everything in behalf of their client that ingenuity could suggest and ability could enforce. We sympathize deeply with them on account of the difficulties which confront them. They must fail in this cause simply because human ability cannot accomplish the impossible. The offense of which their client is guilty is one which strikes at the very foundation of society, and which does more to pollute the fountains of social purity than any class of cases that come before the courts. While it is true that courts should not discriminate in their administration of law as to individuals, yet there are cases where the character and make-

up of a defendant, taken with his conduct and acts and his ability and capacity to know right from wrong, show him to be entitled to a less charitable consideration at the hands of the courts than ought to be extended to ordinary individuals. We think that such is the case now before us, and that the verdict and judgment rendered in this case are altogether legal, just, and righteous. It is sometimes said that a fallen woman is the most depraved of created beings, but we think that the man who is responsible for her fall is must the worse demon of the two. Such characters can expect no sympathy or leniency at the hands of this court.

The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.