## BOB BURCHETT v. STATE.

No. A.-3785. Opinion Filed Oct. 28, 1922.
(209 Pac. 970.)

(Syllabus.)

1. **New Trial—Separation of Jury—Presumption of Performance of Duty.** The legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby.

2. **Same—Separation of Juror During Recess—Necessity for Showing of Injury.** The fact that a juror in a capital case became

separated from his fellow jurors at a recess during the trial, and left the custody of the officer who had the jury in charge, is not sufficient ground to grant a new trial, where it is not shown that the juror engaged in acts or conversation inconsistent with his duty as a juror during such separation. The contrary presumption prevails, where a jury separates after the final submission of the cause.

3.    Homicide—Verbal Insults no Justification for Killing—Mitigation of Punishment. Opprobrious epithets and verbal insults, made towards the accused, however aggravating and contemptible they may be, are not sufficient justification for the taking of the life of the offender: where, under such circumstances, the verdict is for manslaughter, this court will not be justified on account of such provocation in mitigating the punishment fixed by the jury.

Appeal from District Court, Sequoyah County; E. B. Arnold, Judge.

Bob Burchett was convicted of manslaughter in the first degree, and he appeals. Affirmed.

McCombs & McCombs, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. By verdict of a jury on December 6, 1919, Bob Burchett was found guilty of manslaughter in the first degree, and his punishment assessed at confinement in the state penitentiary for a term of 17 years.

The information in this case recited that Bob Burchett committed the crime of murder on November 1, 1919, by shooting Jobe Spence with a shotgun. The pleadings and evidence raised an issue of murder, an issue of manslaughter in the first degree, an issue as to self-defense, and an issue as to which of the parties provoked the difficulty. The testimony is voluminous, but may be summarized as follows:

Some time prior to the alleged killing the plaintiff in error, herein referred to as the defendant, was convicted in

the district court of Sequoyah county of the crime of burglary, and was sentenced to the penitentiary for a term of three years; the deceased, Jobe Spence, was the prosecuting witness in that case. The defendant was released from the penitentiary on August 13, 1918, upon a parole issued by the governor of the state of Oklahoma. This parole was granted upon recommendation of Judge Pitchford, who tried the case and who entertained grave doubts of defendant's guilt; of the state pardon and parole attorney; and of the county attorney who had prosecuted the defendant, this county attorney being also the prosecutor in the case at bar. The parole record was excluded from the jury, but was attached to and made a part of the motion for a new trial.

After defendant's release from the penitentiary he stayed for short periods in various places until the month of January, 1919, when he moved to a small farm near Gans, belonging to his Indian wife. There he lived with his wife, industriously pursuing his labors and conducting himself in a straight-forward, honorable, and upright manner until this difficulty occurred. Soon after the defendant moved to this neighborhood the deceased, Jobe Spence, began to seek and take advantage of opportunities to insult, abuse, and humiliate the defendant in public places and before the citizens with whom he came in contact by referring to him as a convict and a thief, probably for the purpose of provoking a difficulty which would result in the revocation of defendant's parole. This treatment upon the part of Spence continued as opportunities offered until the day of the killing.

On the afternoon of that day defendant left his home and went to the town of Gans to purchase household supplies, and while he was in this little town the deceased, Spence, who was in an intoxicated condition, followed him around from place to place, cursing and abusing him; calling him a thief, and

several times inviting him to fight. The defendant apparently tried to avoid the deceased and as soon as his business was transacted returned to his home. Later Spence, returning to his home, passed along the public highway adjacent to the defendant's premises, arriving at the home of a Mr. Gilbert, located about 300 yards from defendant's home, just about dark. At this time defendant and his wife were seated in their home, with the doors open, and heard the voice of the deceased, who was still upbraiding and abusing the defendant to Mr. Gilbert and his wife.

The defendant's house was about 100 yards from the road, and there was a gap in the fence through which one approached the house from the road. The deceased left the Gilbert home and rode on down the road as far as this gap, where he stopped, and again invited the defendant to come out and fight him. Defendant in his testimony says that he listened to this abuse as long as he could bear it, then took his shotgun, containing one loaded shell, and started toward the spot where the deceased was; that after he had gone 30 or 40 feet his wife persuaded him to return to the house; that the abuse and insults were resumed by the deceased as he passed beyond the gap, whereupon defendant again took his gun and went down toward the deceased. There the defendant said to the deceased, "If you will get off your horse, we will have this out." The deceased then, according to defendant's testimony, made a move, indicating to defendant that he intended to draw a weapon, and the defendant then shot and killed the deceased.

The testimony on the part of the state shows that the body of the deceased was found some little distance from the gap in the fence, in the public highway, at a low place, where there were some trees and underbrush; that there were tracks of a man leading from defendant's house, and, after some deviation, returning to the house; that soon after the tragedy the sheriff and other officers came to the defendant's house,

and found no one there, but found the evening meal prepared and on the table, but undisturbed. They then went to the home of a relative of defendant, where they were informed that the defendant was there in bed. They found him covered up in the bed, feigning sleep. He denied, or at least pretended not to know anything about the tragedy, and also told a falsehood about the whereabouts of his shotgun.

There was evidence tending to show that the character of the defendant, as to his being an industrious, law-abiding citizen, was good; and that the deceased, when intoxicated, was of a turbulent, quarrelsome disposition. There was evidence that each of them had threatened violence against the other; the testimony of a former convict was to the effect that the defendant had told him while in prison that he would some day kill the deceased. Defendant testified that when he heard the abuse and threats of the deceased so near his home on the night of the tragedy it had grown dark, and that he feared and anticipated that the deceased would come to the house and do him and his family great bodily violence and harm. The testimony of both the state and the defense to some extent indicated that there was probable ground for this fear.

The instructions of the court have been carefully considered, and we find that they fairly cover every phase of the issues raised. Without going into a detailed discussion of the instructions given, we hold that the instructions, separately and as a whole, were fair to the defendant.

The defendant earnestly contends that there was prejudicial error committed by the officers of the court in permitting the jurors to converse with witnesses and others after the court had ordered that the jury be placed in charge of a sworn bailiff, with instructions not to permit them to mingle or converse with others. It was shown by ex parte affidavits that during the progress of the trial there were a great many

people attending court; that there were 25 to 30 witnesses for the state, some of whom were actively assisting the prosecution; that on the morning of December 6th the bailiff, accompanied by only 11 jurors, went from the Bonham Hotel to the courthouse, a distance of four blocks, and that the twelfth juror went to the courtroom unaccompanied by the bailiff, and did not reach the courtroom until some little time after the other jurors arrived there; that this twelfth juror went into the courthouse and up the stairs to the courtroom in company with one of the witnesses interested in the prosecution and subpoenaed by the state; and that such conduct on the part of this juror was calculated to be and was in fact prejudicial to the rights of the defendant; that while at the hotel the jurors came in close contact with witnesses and others, in the lobby of the hotel and in the dining room where they sat at a separate table, but in the same room where witnesses and others were seated at other tables, and where conversations were being carried on relative to the trial. There was no showing that any juror conversed with any witness about the facts involved in the case.

The rules established in the several states in this country as to the effect of the separation of a jury or of the misconduct of jurors before final submission of a cause are by no means uniform. This state in an early case, Armstrong v. State, 2 Okla. Cr. 567, 103 Pac. 658, 24 L. R. A. (N. S.) 776, took a middle ground which has since been followed. In the Armstrong Case it was announced:

"The legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that, during an adjournment of a trial, the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby."

In the case of Weatherholt v. State, 9 Okla. Cr. 161, 131 Pac. 185, it was held that the fact that a juror in a capital case became separated from his fellow jurors at a recess during the trial, and left the custody of the officer who had the jury in charge, is not sufficient ground to grant a new trial, where it is not shown that the juror engaged in acts or conversation inconsistent with his duty as a juror during such separation. The contrary presumption prevails, where a jury separates after the final submission of the cause.

In the case of Burns v. State, 8 Okla. Cr. 554, 129 Pac. 657, one of the grounds for a new trial was supported by the affidavit of a witness to the effect that on Friday and Saturday when the trial was in progress, before final submission, the jury were taken to the Holland Hotel office, which was in the front part of the building, and that the bailiff in charge of the jury permitted the jurors to converse indiscriminately with various persons in and about the hotel office, sometimes out of his hearing; that some of them wandered down the hall to the wash-basin and toilet room, prior to entering the dining room for their meals; that some of the jurors used the telephone and talked to persons whose names were unknown. In this case it was held that the motion for a new trial on the ground of improper separation of the jury, supported by such an affidavit, was properly overruled.

In the case of Roddie v. State, 19 Okla. Cr. 63, 198 Pac. 342, a motion for a new trial was supported by affidavits, showing that a juror, Lee Nettles, had formed and expressed an opinion adverse to the defendant previous to his being sworn as a juror, and had made the statement that the defendant was guilty and should be punished; it was shown further that this juror and his wife had their living rooms in the same building with and across the hall from the office of the father of the deceased; that this juror's wife attended

the trial of the case; and sat in the courtroom with the wife and the mother of the deceased; that the juror, during a recess in the trial, went to his living rooms and talked with his wife; that he had first told the bailiff that he wanted to get his overcoat, and one of the bailiffs went and got his coat for him; he then insisted that he should go to his room and get some face cream; the bailiff took the juror upstairs, and allowed him to enter his room; one of the bailiffs followed, and found him talking to his wife and making no effort to get what he said he wanted, and that the bailiff was compelled to forcibly take him from the room and place him with the other jurors. Under the circumstances in this case the court was justified in finding, as it did, that the acts and conversations of this juror, under the circumstances outlined, were prejudicial, whether they occurred before or after the final submission of the cause to the jury; and the holding in the Roddie Case is not in conflict with the former holdings of this court touching the presumption that there was no prejudice in those cases; the presumption that the action of the juror was not prejudicial was overcome by the proof offered.

Following the rule in the decisions above outlined, we hold that there was no sufficient showing made, and no legal presumption arose from the showing, which was made, that the conduct of any one or more jurors in this case operated to the prejudice of the defendant.

Finally, it is urged that the repeated insults of the deceased toward the defendant were calculated to goad a man under such circumstances to acts of violence, and, though not amounting to justification, were sufficient to appeal to the conscience of this court to order a modification of the judgment by reducing the penalty imposed.

The power of this court to do this is conceded, but we must also bear in mind that the authority to grant pardons

and paroles is lodged with the Governor. The facts appearing in the parole record might appeal to the Governor on an application for clemency in this case. We are loath to establish a precedent holding that verbal insults and opprobrious epithets alone are sufficient cause for this court to reduce the punishment fixed by a jury which had before it for consideration all the competent evidence in the case. The letters attached to the parole were not competent evidence. Conceding that the provocation was great, the evidence shows that the deceased was unarmed and was shot from his horse in the nighttime, on the public road, by the defendant in hiding among trees and underbrush. The aggravated provocation was doubtless considered by the jury; otherwise the verdict would probably have been for murder instead of manslaughter.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.