## THE STATE v. CLARK, *Appellant*.

### Division Two, May 8, 1894.

1. **Criminal Practice:** ESTOPPEL. Parties will not be permitted to take inconsistent positions in court.

2. ———: CHALLENGE TO POLLS: WAIVER. A challenge founded on the disqualification by age of four of the panel, though in form to the array, is in fact to the polls and waives further challenge to the polls.

3. ———: EVIDENCE. On a motion to quash the panel the court properly refused to admit evidence to contradict its own records.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

AFFIRMED.

With two others, defendant was indicted for the murder of one Jane Wright by choking her to death. This murder was committed for the purpose of robbery. Deceased was an aged woman, owner of an employment agency in Kansas City, Missouri, who had at the time of the murder, accumulated considerable money, which she carried around with her concealed in her clothing and about her person. Her dead body was

found on the night of September 9, 1893, about 8 o'clock, in her office in Kansas City. The body, when found, was yet warm, her face beaten in with brutal blows, her hands and feet tied, her clothing torn, showing where her savings and her watch had been forcibly taken from her in the uneven struggle for property and life; finger marks upon her throat indicated she was strangled to death, and so it was disclosed on the *post mortem*.

The deed was committed by the defendant, Clark, and his codefendant, Jones. Clark, that same night and within an hour after the murder, gave the watch taken from the dead woman to a friend, who was a bartender, for safekeeping, who, as soon as he heard of the murder, became suspicious and delivered the watch to a police officer, which led to the arrest of both Clark and Jones the following morning. Both parties, after arrest, made full confessions to the chief of police in detail, admitting their guilt, which confessions were taken down in writing; afterward, both persons reiterated the same statements, both at the coroner's inquest and at their preliminary examination before the justice, their confessions being taken down in writing, subscribed and sworn to by them. This is the statement of defendant John Clark at the preliminary examination:

"STATE OF MISSOURI,
"County of Jackson, } ss.
"Kaw township.

"Testimony of John Clark before Ross W. Latshaw, justice of the peace within and for said township, county and state, at the preliminary examination of Harry Jones, John Clark and John A. Bartchy charged with the murder of Jane Wright, held at Kansas City, Missouri, September 12, 1893; said John

Clark having expressed to me, said justice of the peace, a desire to give testimony at this preliminary examination, and being by me first advised that he was charged with murder of said deceased Jane Wright, and that he need not make any statement whatever unless he chose to do so voluntarily and of his own free will, and that any statement he might make could be afterward used against him upon a criminal charge for the murder of Madam Jane Wright, or for being instrumental in her murder, and said John Clark being so advised, and still expressing his wish to testify at said preliminary hearing, and to do so under oath, was duly sworn by me, and upon his oath testified as follows:

" 'My name is John Clark; I am thirty-six years old; I have lived in Kansas City. since September 4, 1893; I came here from Leavenworth, Kansas, and went to Leavenworth from the penitentiary at Lansing, Kansas, where I served five years for burglary in second degree; I arrived here and went to a saloon on Ninth street and asked if there were any crooks came around there, from the porter; he said there did, but there was none there at present; I went out and came back after a little while and was introduced to Jones; this is Harry Jones, the same man who is now under arrest charged with killing Madam Jane Wright; I was introduced to Jones and a man named Bennett; I told him I was hard up, and had been working for about five years but had got no money for it; he said, "there is a woman here running a place; she is doing a good business—making lots of money, and hoards it on her person; it is easy to get; I want some one to go with me." I told him I would go and would meet him the next day on Ninth street at Norton's saloon. I met Jones on Friday, September 8, 1893, at noon, at the saloon on Ninth street. He went with me and showed me the place where Madame Wright's office was; we

talked over the robbery at that time, and I agreed to meet him that night about 5 o'clock opposite the intelligence office on East Ninth street; I was late and did not get off until 6 o'clock, and he says, "I seen the clerk go home, and Mrs. Wright come out a little while after and go home; it's too late to do the job to-night." He told me to meet him at the same place Saturday (September 9, 1893), at 5 o'clock.

"'I went around Saturday night, as agreed by us, and met him there, opposite Madame Wright's office. He said that the clerk was out on an errand, and that she would be back and that I could see her. We waited perhaps fifteen minutes, when she came from around the corner and went upstairs. I then went up to the corner on Ninth and Walnut streets and staid there until 6 o'clock. I then came down to where Jones was waiting, and staid until the clerk of Madame Wright had left for home. When the clerk left he went upstairs and came to the window, and I went over across the street and went upstairs in the building where Madame Wright's office was. I stopped at the head of the stairs and looked down. Then I came over to the office door which was ajar; I looked in; Jones says, "come in and shut the door." I went in and bolted the door. I saw the woman lying on the floor, with Jones partly sitting on her, with his hand on her throat. He says, "she ain't got the stuff in her bosom, you feel down her leg for it." I felt down her leg, and could feel nothing unusual there. I said that she hasn't got anything; let's go. He says, "she has got it about her somewhere." Just then I heard some one coming up the steps. I went over to to the door and listened, and some one tapped at the door and walked away. I went back to where Jones was; he said, "I've got it." He was cutting a cord in two. He says, "we will tie her feet and hands." He

tied her feet. I crossed her hands and he tied them, and we then went out. I heard a groan before I went into the room, and after I went in she moved her feet. We came down stairs and went down the street, up through an alley; in the middle of the alley was a vacant house. We went in there to divide the money, but somebody hallooed. We came on up through the alley, walked back again a block or two, and finally got to this vacant lot. We went over into the lot opposite the lot, and there divided the money. Jones took a leather pocketbook out of his pocket and gave me $160, and had $170 for himself. He says, "take this watch and that will square us." I took the watch, went over the fence and said "good-bye" to Jones. He says, "I am going down to the state line; take care of yourself!"

"'We then parted. I came down to Murray's saloon on Fifth street, and had several drinks in there. I gave Charlie Cheeks $20, then I came out and bought a hat. I met Cheeks again in front of a restaurant, on the sidewalk, and asked him to go up town. We went into several saloons, and had a drink in each one, and from there we went to a lodging house and I paid for a room, and we went to the room and straightened up the money. I took the watch out of my pocket and put my money in the pocket I had taken the watch out of. Cheek said, "give me the watch; I will give it to my girl." I gave him the watch. This was the watch that was supposed to have been taken from Madam Wright, and the watch that Jones gave me when we divided the proceeds of the robbery of Madam Wright; we came down stairs and separated. I went down to Stock's saloon on Union avenue, and asked for Stock. The bartender said he was not in, but would be back in a few minutes. I gave the bartender $2 to give to Stock. I was about to go away

when Stock came; when Stock came in the bartender handed him the $2. Stock and I went into a side room, and I counted out $100 to Stock and he gave me a receipt for it. He says, "I am going to Oklahoma Monday or Tuesday; come and go down with me. We will make some money down there." I told him I would. He says, "give me the rest of the money, and I will keep it for you." I then gave him $20, and I told him I wanted to buy a shirt and some clothes. He says, "come on and I will show you where to get them." I went with him and bought clothes to the amount of nearly $5. He paid $5, and took the change remaining. I then went back to Stock's saloon, and from there I went to bed.

"'I got up the next morning about half past 6 and went to Stock's saloon and got $10 from him. I went down to the west part of town, where elevated railway runs, and staid down there till nearly noon. Then I came back to Stock's place and had a drink; got $5 from Stock, when Charlie Cheeks came it. I had a drink with him, and went out on the street, and was arrested by the officers and taken to the police station. I am still under arrest. When Jones told me about the robbery he said he would go up, and when he came to the window for me to come up.

"'I also further state upon my oath that before the commencement of this testimony, and before I was sworn, that I was informed by the justice of the peace, who is conducting the preliminary examination, that I could make such statements as I desired to make, and that I need not make any statement at all in case I do not desire to do so. I was, at the time of giving my testimony, and am now, a prisoner undergoing preliminary examination on a charge of murdering Madam Jane Wright; and I further state that all the foregoing testimony was given by me

freely and voluntarily, and is given without fear of punishment or reward therefor, and understanding the facts of my position as a prisoner; and I further state that I have read carefully every word of this testimony of mine before signing my name hereunto.

"'Witness my hand, this twelfth day of September, 1893.

"(Signed)          JOHN CLARK.'

"Subscribed and sworn to before me, this twelfth of September, 1893.  .          Ross W. LATSHAW,

"Justice of the peace of Kaw township, Jackson county, Missouri."

The defendants asked a severance. Clark was first tried, the jury finding him guilty of murder in the first degree, and he has appealed to this court.

The only point of contest in the lower court, or in this court, relates to the impaneling of the traverse jury. The statement of the attorney general having been found correct, is, with slight modifications, adopted. Upon the day the court began to impanel the trial jury, there were then in attendance twenty-eight qualified jurors in the regular panel, who had been drawn from the jury wheel in strict compliance with the law's requirements. The court then proceeded to obtain the extra jurors to complete the panel by a literal compliance with section 6 of the act of 1891, page 173. Upon the *voir dire* examination of the jurors, who were sworn and interrogated, twelve at a time, defendant's counsel was asked if he had any objection to a single juror in each bundle of twelve, and he replied that he had no objections whatever to offer to any of them; and again, when the panel of forty-seven was finally obtained, the court again asked defendant's counsel if he had any objections to offer to any member of the panel of forty-seven, defendant's counsel

replying that he had no objection whatever to offer to any member of the panel of forty-seven.

During this *voir dire* examination, four jurors had answered that they were over sixty-five years of age. Section 8 of said act states that persons over sixty-five years of age shall not be permitted to serve as jurors; yet defendant's counsel, with full knowledge of the age of the aforesaid four jurors, waived all objections to them on that ground, and stated in answer to interrogatories of the court that he had no objection whatever to any of the panel on any ground.

The *voir dire* examination of the jurors was completed on Tuesday, October 31, 1893, and the full list of the forty-seven qualified jurors accepted as qualified by defendant, was furnished to defendant on that day at 4 o'clock, P. M.; the prosecuting attorney then stating that if defendant desired, he would make his challenges at once, the defendant not requiring or asking it to be done. Defendant took the forty-eight hours allowed him by law in which to make his challenges, and the courts postponed further proceedings, in order to allow defendant the full forty-eight hours, until Friday, November 3, 1893, at 9 A. M., thus giving defendant sixty-four hours instead of only forty-eight.

When the court again met on Friday at 9. A. M., November 3, the prosecuting attorney had already handed to defendant, before court opened, a list of the state's challenges; yet, notwithstanding the fact that defendant was then in possession of the state's challenges, and had had sixteen hours over the forty-eight hours allowed him in which to make his challenges, defendant, nevertheless, as soon as court opened, filed a motion untruly reciting that he had not been furnished with a list of the state's challenges, nor allowed the forty-eight hours in which to make his challenges, defendant claiming the right to have an additional

forty-eight hours after the state's challenges had been furnished him, before being required to make his challenges. Although the statute very clearly does not give defendant any such right, nevertheless, the trial court, out of abundant caution, yielded to defendant's request, and granted him another forty-eight hours, and again postponed all further proceedings until Monday, November 6, at 9 A. M.

At this time defendant already knew of the facts as to the four jurors being over sixty-five years of age, and had waived it; and if he intended to make objections thereto, then in common fairness and courtesy to the court, he should have stated it on this day. When making objections to the jury, he should have stated all his objections, but he did not do so. On Monday, November 6, at 9 A. M., it was almost six days, one hundred and thirty-six hours, after the panel of forty-seven had been handed to defendant.

On this day defendant, having conceived an additional cause for delay, filed another motion to quash the panel, because three of the jurors, Patton, Patterson and Irwin, were over 65 years of age. Mr. Boles, another juror of the forty-seven, had stated upon *voir dire* examination that he, also, was over sixty-five years of age, but defendant's counsel, realizing the court had overlooked that fact, sought to obtain a favorable ruling from the court upon the point as to the three jurors, and thereby secure another forty-eight hours' delay and then, at its expiration, securing a still further forty-eight hours' delay by springing Mr. Boles' name also upon the then astonished court. This was only prevented by the prosecuting attorney calling the court's attention to the matter, and even then defendant would not include Mr. Boles' name in the motion, until the court practically compelled him to do so.

Thereupon the court discharged the four jurors

who were over sixty-five years of age, and, acting under section 6 of the aforesaid act, secured additional jurors to complete the panel of forty-seven, defendant then again stating that he had no objections to offer to the four additional jurors then just selected, nor to *any of the panel of forty-seven.* Defendant was then furnished with a complete list of the completed panel of forty-seven, and also with the state's challenges from said list, and was then given another forty-eight hours in which to make challenges in addition to the one hundred and thirty-six hours which he had already had, and the court again, for the fourth time, stayed further proceedings in the case until Wednesday, November 8, at 10 A. M., until the said additional forty-eight hours should expire.

On Wednesday, November 8, 1893, about eight days or one hundred and eighty-four hours after the first impaneling of the complete panel, and after five delays had been secured on trivial and annoying objections on the part of defendant, and after defendant's counsel had repeatedly stated that they offered no objection to the jury, or to any member upon it, defendant interposed still another motion to quash the panel, said motion containing allegations of fact as to former proceedings of the court in the case which had no foundation whatever in fact; thereupon the court overruled defendant's motion, and defendant excepted.

After the court had overruled this last motion, and the matter was then ended, defendant offered to prove totally irrelevant and untrue allegations by witnesses who were not present and had never been subpoenaed. That such was the opinion of the trial court in regard thereto is shown by the following language taken from the bill of exceptions: "The same was so refused by the court because the same would have been an absolute contradiction of the record of the court,

and because the court knew that no such facts as those offered to be proved did in fact exist."

Thereupon the defendants, after having wasted over a week, or about one hundred and eighty-five hours, in a struggle with the court, in efforts to inject some error into the case upon the pretext of wanting more time in which to make challenges, flatly refused to make any challenges whatever, and the court, in compliance with Revised Statutes, 1889, section 4205, ordered the clerk to call the first twelve names on the list remaining unchallenged, as the jury to try the cause.

*Gatts & Griggs* for appellant.

(1) It is the duty of the court to see that a proper jury is impaneled, and that there should be summoned and returned in every criminal cause, a number of qualified jurors equal to the number of peremptory challenges and twelve in addition, and no party shall be required to make peremptory challenges before a panel of such number of competent jurors shall be obtained. R. S. 1889, sec. 4203. (2) The jurors were not selected in accordance with the act approved April 1, 1891. (3) Defendant's motion to quash the array of the panel of jurors was made in due time, nothing was waived, and the testimony offered to prove the truth of the causes assigned in said motion should have been received and considered by the court. The testimony was material and competent, and it was error on the part of the court to exclude it. Thompson on Trials, sec. 685; *Scotland Co. v. Hill*, 112 U. S. 183–186. (4) The affidavits offered by the state in opposition to the defendant's motion for new trial, and thus meet the issue tendered in defendant's motion to quash the array of the panel, are *ex parte* and should not be

now considered by this court, as the defendant tendered such issue in said motion and was not permitted to offer his testimony upon it. (5) The length of time between the thirty-first day of October and the eighth day of November, 1893, was too long a time to allow the jury to separate among the citizens where the homicide was alleged to have been committed, to be an impartial and unprejudiced jury, and defendant had a right to be tried by an impartial jury. Const., sec. 22, art. 2.

*R. F. Walker*, Attorney General, and *Marcy K. Brown* for the state.

(1) The indictment is sufficient; appellant concedes its sufficiency. R. S. 1889, sec. 3459; *State v. Meyers*, 99 Mo. 107; Kelley's Mo. Cr. Pr. and Proc. [last Ed.], p. 310; Bishop's Directions and Forms, sec. 520, p. 283, and authorities cited in note 3, on page 283, and note 1, on p. 284; *State v. Avery*, 113 Mo. 480; *State v. Anderson*, 89 Mo. 313; *State v. Payton*, 90 Mo. 220; *State v. Miller*, 100 Mo. 624. (2) No error is claimed by appellant except in the selection and impaneling of the trial jury. The panel from which the trial jurors were selected was composed of forty-seven qualified jurors, from which defendant was to have twenty challenges; this was proper. R. S. 1889, secs. 4202, 4200. (3) The court, finding that a jury for the trial of the case could not be made up from the regular panel, proceeded in literal compliance with the law to obtain the nineteen special jurors necessary to complete the panel. Laws of 1891, p. 173, sec. 6; *State v. Sansone*, 22 S. W. Rep. 617. (4) Upon the *voir dire* examination of the jurors, defendant, being asked by the trial court if he had any objections to make to the panel of forty-seven, or to any member of

it, stated in positive terms that he had no objections whatever to offer. Even if any error had existed, this was a waiver of it, and defendant could not afterward object. *State v. Breen*, 59 Mo. 413; *State v. Jones*, 61 Mo. 232; *State v. Wood*, 74 Mo. 256; *State v. Knight*, 61 Mo. 373; *State v. Matthews*, 88 Mo. 123; *State v. Thornton*, 108 Mo. 656; *State v. Gleason*, 88 Mo. 582; *State v. Sansone, supra.*

SHERWOOD, J.—I. We see no reason to doubt the correctness of the action of the trial court. It certainly proceeded in conformity with section 6 of the act of 1891, already referred to, which provides that, "when a jury for the trial of a cause can not be made up from the regular panel, the judge of the court before whom the cause is pending may make out and deliver to the proper officer a list of jurors sufficient to complete the panel," etc. *State v. Sansone*, 116 Mo. 1.

II. And, even if error did occur, there was a clear waiver of it by the course of conduct pursued by defendant's counsel from time to time, while they were engaged in manufacturing excuses for additional delays. The reports of this court abound with instances where, in similar circumstances, the doctrine of waiver has been applied. Some of these cases appear in the briefs of counsel.

Parties litigant are not allowed to take inconsistent positions, as attempted in the present instance. They will not be permitted to cause the court and adversary counsel to pursue a certain course, and then at the outcome deny and repudiate the legal validity of that very line of conduct, and thus "tread back and trip up the heels of their adversary." *Slack v. Lyon*, 9 Pick. 62: *Brown v. Bowen*, 90 Mo. 184; Bigelow on Estop. [3 Ed.], pp. 562, 601, 602; *McClanahan v. West*, 100 Mo. 309.

The State v. Clark.

III. At common law, and where unchanged by statute, a challenge to the array had to be made in writing, though challenges to one or more individuals on the panel could be made *ore tenus*. 1 Chit. Crim. Law, 546; 2 Tidd's Prac., 851; *People v. M'Kay*, 18 Johns. *loc. cit.* 218. And after a challenge to the array, the party may challenge the polls; but after he has excepted to any of the individual jurymen, he can not object to the whole panel. 1 Chitty's Crim. Law, 545.

In this instance though the first challenge to the array was one in form, yet it was based on objections to four individuals of that panel, and for the reason that they were over the age of sixty-five years. This challenge, therefore, was simply a challenge to the *polls*, and after such a challenge a party is not allowed to challenge the array. So that, the trial court on that ground alone, properly denied the subsequent challenge to the array, inasmuch as, under the authorities cited, the challenge to the array had been waived.

IV. The offer on behalf of defendant to introduce evidence to contradict the records of the court and the recitals of the facts as now contained in the bill of exceptions was properly rejected. No number of witnesses could be received to accomplish such a result. *State v. Blunt*, 110 Mo. 322; *State v. Hayes*, 81 Mo. 574; *State v. McNamara*, 100 Mo. *loc. cit.* 122, 123. The trial judge, knowing what his records should and did contain, would have stultified himself had he permitted any witness or witnesses to have gainsaid the truth of those records. The recitals in the bill of exceptions already quoted, importing absolute verity, place this matter on an impregnable basis.

V. In conclusion, the verdict of the jury could not have been otherwise. The defendant stands before us

a murderer self-confessed, without a single palliating circumstance to extenuate the enormity of his brutal crime. We, therefore, affirm the judgment and direct that the sentence pronounced be executed. All concur.