# NEWTON HENRY v. STATE.

No. A-1775.    Opinion Filed December 13, 1913.

(136 Pac. 982.)

1. **APPEAL—Brief—Citations.** Where counsel rely upon Oklahoma cases in support of their propositions, they must in their briefs cite the page and volume of the Oklahoma Reports where such cases may be found.

2. **EVIDENCE—Testimony on Prior Trial—Admissibility—Harmless Error.** (a) Where a witness has testified for the state in a criminal case, and said cause is tried again, and the state proves that such witness had left the state declaring that he was going into another state, and a subpoena is issued for said witness to testify in behalf of the state, and the sheriff's return thereon shows that the witness could not be found in the county in which the cause is pending, the testimony of the witness given on such previous trial may be admitted on behalf of the state or the defendant.

    (b) If the court should err in the admission of evidence on the part of the state, and subsequently thereto the defendant takes the witness stand in his own behalf, and admits the truthfulness of the evidence so erroneously admitted, such error becomes harmless and will not be ground for reversal.

3. **APPEAL—Presumption of Regularity—Presence at Trial—Waiver of Rights.** (a) Every presumption of law must be indulged in favor of the regularity of the proceedings in courts of record, and if the record shows that the defendant was present when the trial began but is silent as to the presence of a defendant during the trial, in the absence of an affirmative showing that the defendant was actually absent, and that such absence was not the result of his consent or procurement, a judgment will not be reversed because the record did not show affirmatively the presence of the defendant.

    (b) Humphrey v. State, 3 Okla. Cr. 504, 106 Pac. 978, 139 Am. St. Rep. 972, expressly overruled. Wood v. State, 4 Okla. Cr. 436, 112 Pac. 11; Mendenhall v. United States, 6 Okla. Cr. 436, 119 Pac. 594; Killough v. State, 6 Okla. Cr. 311, 118 Pac. 620; Williams v. State, 7 Okla. Cr. 251, 123 Pac. 190, 126 Pac. 697; Burns v. State, 8 Okla. Cr. 554, 129 Pac. 657—cited and reaffirmed.

    (c) Any statutory or constitutional right of a defendant not inalienable may be waived, where it can be done without affecting the rights of others, and without detriment to the community at large, and where it does not affect the jurisdiction of the court as to the subject-matter. State v. Frisbee, 8 Okla. Cr. 406, 127 Pac. 1091, reaffirmed.

4. **TRIAL—Presence of Defendant—Necessity.** It is not necessary that a defendant should be present when a motion for a change of venue, or a motion for a continuance, or a motion for a new trial is argued and submitted.

5. **APPEAL—Judgment—Arrest of Judgment.** For assignment of error not supported by the record, see opinion.

6. **HOMICIDE—Death Penalty—Sufficiency of Evidence.** For a case in which a verdict of assessing the death penalty is sustained by the law and evidence, see statement of evidence and opinion.

7. **CONSTITUTIONAL LAW—Pardon—Commutation of Sentence—Officers—Duties.** (a) No official of Oklahoma has the shadow of a right to set aside or disregard the laws of this state, as a matter of whim or caprice.

    (b) Officials should set an example of obedience to law. If they disregard the law, how can they blame the people for taking the law into their own hands?

    (c) The Governor is without the lawful right to set aside and nullify the law inflicting the death penalty for crime in all cases upon the ground that he is opposed to capital punishment.

*Appeal from Superior Court, Oklahoma County;*
*Edward D. Oldfield, Judge.*

Newton Henry was convicted of murder, and appeals. Affirmed.

See, also, 6 Okla. Cr. 430, 119 Pac. 278.

Sam Bartell testified that in June, 1911, he was a justice of the peace of the Oklahoma City district; that on the 23d day of June, a little after 12 o'clock, he went to the Carrington Hotel in Packingtown, Oklahoma City, and there found Charley Lucas lying dead on the ground with his feet toward the porch; that there was a gunshot wound entering his body right over the heart; that the deceased was in his shirt sleeves; that he searched the body, and found no weapons on it or about it. ·

Robert Dunn testified: That in 1911 he lived in Packingtown, Oklahoma City, and was a carpenter by occupation. That he was acquainted with Charley Lucas in his lifetime, and saw him last alive about 12 o'clock on the 23d day of June, 1911; and that deceased was working for, and residing with, witness, three or four blocks from the Carrington Hotel. That after deceased had his dinner he left the home of the witness, stating that he was going to go to the home of Lucy Carrington. He said he was going for his clothes. Deceased was dressed in

trousers and undershirt.   Deceased was not armed at the time.
That deceased did own a pocketknife, but it was left in the inner
pocket of his coat hanging on the side of the wall.   That wit-
ness knew the defendant, Newton Henry; had a conversation
with him the morning before the shooting.   Defendant told wit-
ness that he had had trouble with Charley Lucas, and said that
Charley was after his woman.   He said, "The crazy son of a
bitch is after my woman."   He also stated that Charley Lucas
owed him 60 cents, and that he (defendant) had run him away
from his house and said that if he ever caught him there again
he would kill him.   This conversation occurred on the morning
of the day of the killing.   Witness heard the shooting.   Two
shots were fired.   A little boy came up, and said that defendant
had killed Lucas, and called on witness to run and catch him.
Witness went immediately to the place where the shooting had
occurred.   When he got there, defendant had gone to the river
bottom.   Defendant was going west, then turned and went south.
Witness could not get close enough to the defendant to have any
conversation with him.   Witness then went to the Carrington
Hotel, and found Lucas lying there dead on the ground.   Wit-
ness saw no knife or other weapon around there.   Witness testi-
fied that he was acquainted with one Steve McNeal; that the
said McNeal left the state of Oklahoma soon after the trial of
the case was over, and went to the state of Texas.   This evi-
dence was received without objection.

J. G. Dunn testified that he was acquainted with a man
named Steve McNeal, or "Trust Luck"; that after the first trial
in this cause the said "Trust Luck" left the state of Oklahoma,
and said that he was going back to Texas.

The state then introduced a subpoena issued on the 10th
day of April, 1912, by the clerk of the superior court of Okla-
homa county, for the said Steve McNeal to testify in this cause,
as a witness on behalf of the state, which subpoena was returned
in court indorsed as follows on April 11, 1912:

"I cannot find the within named Steve McNeal within my
county.   He is dead.   [Signed] Jack Spain, Sheriff, by E. L.
Stout, Deputy."

Upon this showing that the said Steve McNeal was absent from the jurisdiction of the court and could not be produced as a witness, the state then introduced L. J. Sartain, who testified that he was court reporter in the superior court of Oklahoma county in July, 1911; that as such reporter he took the testimony in the former trial of this case; and that Steve McNeal, or "Trust Luck," then testified as a witness for the state; and that what purported to be a copy of the testimony of the said "Trust Luck," which was handed to the witness for his inspection, was a true and correct copy and transcript of the testimony given by said witness on said trial. To the introduction of this evidence, counsel for appellant made a general objection that such evidence was not admissible unless the state first proved that said witness was without the jurisdiction of the court, and, further, that due diligence had not been used by the county attorney's force to bring said witness into court. Which objection was by the court overruled. To which counsel for appellant excepted. Thereupon the state read the testimony given by the said Steve McNeal in the former trial of this cause. Said witness testified that he knew Charley Lucas in his lifetime, and that he remembered the occasion of his being killed by the defendant at the Carrington Hotel on the day of the 23d of June, 1911. About two days before the killing, the defendant told witness that the Carrington Hotel had changed hands, and that he (defendant) was now the sole owner of the same; and he desired to get something to protect the house with, and wanted to buy a pistol from witness for this purpose, and obtained a pistol from witness. Defendant also told witness that he had been cleaning out the house since he got possession of it; and also told witness that deceased, Charley Lucas, owed him 60 cents, which he refused to pay, and that he had ordered the deceased out of the house, and that deceased had appeared to be looking for something to fight with, after he walked out of the house.

Lucy Carrington testified: That on the 23d day of June, 1911, she was living at the Carrington Hotel in Packingtown, Oklahoma City, Okla., and that she had resided there since the preceding February. That she was acquainted with both the

deceased and the defendant, and had been running the Carrington Hotel, until about two or three weeks before the killing, when she sold her interest to the defendant. That after witness sold her interest in the hotel to the defendant she remained there as cook. That the husband of witness had become involved in some trouble in Oklahoma City, and had left the state and gone to Kansas, and had not returned since. That the deceased, Charley Lucas, had been living at the Carrington Hotel until about two days before the killing. That, when deceased left the Carrington Hotel, he left his clothes for the witness to wash for him. That about 12 o'clock on the 23d day of June, 1911, the witness was in the kitchen getting dinner at the Carrington Hotel. That she saw deceased coming to the porch of the kitchen about six or eight feet from the porch. That deceased said to her: "Good morning. I came to get my clothes. Have you got my clothes done? I want to go in town this afternoon, and thought I would come up and see if you have got my clothes done." And witness replied that she had them washed, but had not ironed them yet, and that she would send them to him by her little boy that afternoon. That just then the defendant walked into the room, and said to deceased: "I told you to stay away from here; you went away owing me." Deceased replied, "I came here after my clothes." Defendant then rushed on deceased with a gun. Deceased then had his hands upon a clothes line. The gun fired twice, and deceased sank down in a heap. He did not say a single word. Defendant walked back to his room and came out putting on his coat and had his hat on his head, and witness said to defendant, "Don't kill him," and defendant made no reply. That defendant walked up to a table on the porch. That there was an old rusty butcher knife lying on this table back of some pans. Defendant picked up this knife, looked at deceased, and then looked at witness. The witness then became frightened and ran back into the house, and did not see defendant any more until after he left the building. Witness heard defendant say, when he left the building, that deceased had drawn that knife on him. Witness stated deceased had not drawn the knife on defendant; that no one else saw the killing besides witness, so far as she

knew. This witness was subjected to a severe and searching cross-examination, but her statements with reference to the killing were in no manner weakened or impaired thereby.

Jack Spain testified that on the 23d day of June, 1911, he was sheriff of Oklahoma county; that immediately after the killing witness searched the premises for defendant and was unable to find him; that defendant was not arrested until 8 o'clock p. m., when he was found in a pool hall, and arrested by a deputy sheriff.

J. H. Reder testified: That on the 21st day of June, 1911, he heard the defendant say that he had some trouble with the deceased; that deceased owed defendant a little room rent, and deceased seemed to think he did not owe it. Defendant stated that he then went and got a knife, and when he got back deceased was gone. Defendant said, "If I had found him, I would have tried to get it from him," and further stated, "I will either get my 60 cents or get him (deceased)."

The state here rested its case.

Defendant, Newton Henry, testified in his own behalf: That on the 7th day of June, 1911, he came into possession of the Carrington Hotel as lessee. That it was turned over to him by Lucy Carrington. That he knew deceased, Charley Lucas. That he was renting a room at the Carrington Hotel. That he was paying $4 per week for room and board. That deceased left the house on the 17th day of June without paying defendant a single cent of what he owed him. That defendant talked to the deceased about paying his board bill twice, and that deceased kept putting him off. That deceased stole his clothes out of the building a couple of days before the killing. That the deceased returned to the hotel, and defendant then said to him, "If you won't pay me, why don't you stay away?" That when deceased came to the hotel he generally talked with Lucy Carrington. That he bought the pistol on the Monday before the homicide for the purpose of protecting his house. That on the day before the killing Bob Dunn informed defendant that Charley Lucas was going to kill him (the defendant) about the Carrington woman. That about 12:30 o'clock, while he was cleaning up the

house, he started to go to the pump to get some water, carrying his pistol in his pocket. Just as he turned the corner he saw the deceased at the kitchen door. That when defendant saw deceased he ordered him to leave, to go away. That deceased was sort of bent over as if he was watching and waiting for something. That the deceased made a break toward him, and said, "I will put you away," and that he shot deceased. That he shot deceased because he was scared and did not know whether deceased would shoot him or cut him. Doesn't remember whether he shot once or twice. That after the shooting defendant saw a knife about two feet away from deceased on the ground.

Counsel for defendant then said: "We want to introduce the testimony of Steve McNeal. Do you want me to go through and make another showing." The county attorney replied, "No, I am willing for the record to show that you introduced the testimony of the same witness that I offer." Counsel for defendant then said: "All right. Gentlemen of the jury, this is the testimony of Steve McNeal, the same witness that Mr. Hooker read the testimony of, the man that was supposed to be dead. On the other trial there were not many witnesses around, and we just grabbed up one of the state's own witnesses, and I want to read you his testimony." Said witness testified that he knew the defendant, and had known him since the previous November; that he was acquainted with the general reputation of the defendant in that community for peace and quietude; and that such reputation was good.

J. F. Palmer testified for defendant that the general reputation of the defendant for peace and quietude in the community in which he resided was good.

Neal Shaw testified for defendant that a few days before the shooting he heard a conversation between deceased and defendant about a bill which was due the defendant. Defendant told deceased that he did not want him in the house, and for him to go out and never come back again; and that the deceased gave the defendant some back talk. The witness heard shots fired in the difficulty in which deceased lost his life. He heard the defendant say, "I thought I told you to say away from this

house." If the deecased made any reply, witness did not hear it. Immediately after this he heard the shots fired.

Judge Peters testified for defendant that the general reputation of the defendant for peace and quietude was good. Several other witnesses testified in behalf of appellant to the same effect.

Defendant here rested his case.

*James S. Twyford,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, J. (after stating the facts as above). First. In the brief filed in this cause counsel for appellant referred to a number of the decisions of the Supreme Court of Oklahoma, and also of this court, without giving the page and volume where such decisions could be found. In Appendix C of the second volume of the Revised Statutes of Oklahoma, 1910, will be found the rules of this court. On the subject of briefs these rules say: "All citations of Oklahoma cases must be by the volume and page of the Oklahoma Criminal Reports." We have had frequent occasion to call the attention of the bar to this rule. See *Johns v. State,* 8 Okla. Cr. 585, 129 Pac. 451; *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685; *Tucker v. State,* 9 Okla. Cr. 587, 132 Pac. 689. We have no objections to citations being made to any other reports; but the Oklahoma Criminal Reports are published by the state officially, under the immediate supervision of the members of this court. They can be purchased for a nominal sum, and lawyers who cite Oklahoma cases must give the page and volume of the official reports where they can be found. They are conveniently at hand, and such citations greatly expedite the labor of this court. Those lawyers who intend to practice law in this court should make themselves familiar with, and conform to, the rules of the court. Unless they do so, in ordinary cases their briefs will not be considered; but, as this is a capital case, and as the extreme penalty of the law has been assessed by the jury, we will relax the rule in this instance, as we do in all cases of great gravity, and will treat the brief of counsel for appellant

as though it were in strict compliance with the rules of the court and in all respects regular.

Second. Counsel for appellant contends that the testimony given by Steve McNeal upon the former trial of this cause was improperly admitted in evidence over objections of appellant. It was proved that the said McNeal had left Oklahoma county, stating that he was going to Texas, and that a subpoena had been issued for him to testify as a witness for the state upon the present trial, and this subpoena had been brought into court with a return thereon indorsed by the sheriff of the county that the said Steve McNeal could not be found in Oklahoma county. In the absence of a showing that the witness was within the jurisdiction of the court, we think that this authorized the admission of the testimony of the said Steve McNeal. See *Hawkins v. United States,* 3 Okla. Cr. 651, 108 Pac. 561; *Warren v. State,* 6 Okla. Cr. 1, 115 Pac. 812, 34 L. R. A. (N. S.) 1121. Even if there were any question about this, the record also shows that, subsequent to the admission of this testimony, evidence given upon the other trial by the said Steve McNeal in favor of appellant was offered in evidence by his counsel upon the ground that said McNeal was beyond the jurisdiction of the court. This places the matter beyond question and waives any possible error that there may have been in the admission of the testimony originally. Appellate courts will not permit litigants to take inconsistent positions before them. See *State v. Clark,* 121 Mo. 500, 26 S. W. 562. If it be conceded that the admission of the testimony of the said Steve McNeal was error, such error would not be ground for reversal, because the material facts testified to by the witness McNeal were admitted to be true by appellant when he took the witness stand. Therefore appellant could not have been injured by McNeal's testimony, and it would be a burlesque upon justice and bring the law into contempt to reverse a conviction on account of the admission of testimony which was admitted to be true by the defendant himself.

Third. Counsel for appellant in his brief says: "The record shows that upon resting the case the court instructed the jury in writing, and is silent as to the argument of counsel." Upon

this omission of the record to state that argument was made, counsel takes the position that the judgment must be reversed, because the record does not affirmatively show that argument was made and that appellant was present during said argument. In support of this contention, he cites the case of *Humphrey v. State,* 3 Okla. Cr. 504, 106 Pac. 978, 139 Am. St. Rep. 972. *Humphrey v. State* was modified in *Wood v. State,* 4 Okla. Cr. 436, 112 Pac. 11, and also in *Mendenhall v. State,* 6 Okla. Cr. 436, 119 Pac. 594, and again in *Williams v. State,* 7 Okla. Cr. 251, 123 Pac. 190, 126 Pac. 697; and, upon a more full investigation of all the authorities and the reason of the law, *Humphrey v. State* was expressly overruled in *Burns v. State,* 8 Okla. Cr. 554, 129 Pac. 657, which contains a full discussion of the authorities upon this question and announces the settled policy of this court.

It is true that the defendant has the constitutional right to be heard in person or by counsel in the argument of his cause. It is also true that defendant had the right to be personally present during every stage of the proceedings of his trial, and, if the record affirmatively shows that the defendant was deprived of either of these rights, a judgment must be reversed. These are rights which may be waived, and unless they are asserted at the trial the presumption of law will be that they were waived, unless the contrary affirmatively appears in the record. Every presumption of law is in favor of the regularity of proceedings in courts of record. In *Killough v. State,* 6 Okla. Cr. 311, 118 Pac. 620, Judge Doyle said:

"Error must affirmatively appear from the record; it is never presumed. Every presumption favors the regularity of the proceedings had upon the trial. The plaintiff in error must affirmatively show prejudicial error; otherwise the judgment of the trial court will be affirmed."

When a record is silent upon the subject of the argument of counsel, the presumption of law is either that argument was waived or it was omitted from the record through the carelessness of the clerk. It would be a great reflection upon the intelligence and fidelity of the counsel, who represented appellant in

the trial court, to assume that he allowed the case to be submitted to the jury without argument, unless it was done by consent of appellant, or that he allowed the case to be argued in the absence of appellant without objecting thereto, unless such absence was at the request of appellant. Any statutory or constitutional right of the defendant not inalienable may be waived, where it can be done without affecting the rights of others, and without detriment to the community at large, and where it does not affect the jurisdiction of the court as to the subject-matter. A failure to insist upon such right in seasonable time will operate as an estoppel to his afterwards setting it up against the state. See *State v. Frisbee,* 8 Okla. Cr. 406, 127 Pac. 1091. By the express terms of section 6005, Rev. Laws 1910, this court is forbidden to reverse any conviction on account of any error in the proceedings, unless, after an examination of the entire record, it appears that the error complained of has deprived defendant of some substantial right, or has resulted in a' miscarriage of justice.

Fourth. Counsel for appellant contends that this judgment must be reversed because appellant was not present when his motion for a new trial was argued. There are two conclusive answers to this contention: First, there is nothing in the record which indicates that appellant desired to be present when such argument was made, or that he did not consent that such argument might be made in his absence; therefore, even if this were a good objection, the failure of appellant to assert his rights at the time would operate as a waiver on his part of any right which he may have had in the matter. In the second place, there is no provision of law requiring that a defendant must be present when a motion for a new trial is argued. Such proceeding is no part of the trial proper any more than a motion for a change of venue or a motion for a continuance; but, on the contrary, a motion for a new trial asks a review by the judge of the trial, which has concluded. Counsel could with as much show of reason claim that a defendant should be present in this court when his application for a new trial is argued, submitted, and decided. A trial begins when the jury are called into the box to be examined as

to their qualifications (see *Caples v. State,* 3 Okla. Cr. 72, 104 Pac. 493, 26 L. R. A. [N. S.] 1033), and ends when the jury have returned their verdict; and if it affirmatively appears from the record that a defendant, without consent on his part, was absent during any of such proceedings, the judgment will be reversed; but, as far as the law goes, no good reason can be shown why a defendant should be present when a motion for a new trial, a motion for a continuance, or a motion for a change of venue is being argued. It has been expressly decided in Oklahoma that such presence is not necessary. See *Ward v. Territory,* 8 Okla. 12, 56 Pac. 704; *Saunders v. State,* 4 Okla. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766; and *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356.

Fifth. In his brief counsel for appellant says: "The court erred in refusing the plaintiff in error the right to file a motion in arrest of judgment before sentence." We have diligently searched the record and have failed to find that counsel for appellant asked permission or attempted to file a motion in arrest of judgment, and that the court denied him this right; we have also examined the record critically to find, if we could, as to whether or not there was any ground for arresting this judgment, and we find that there was none, and that, on the contrary, the proceedings and papers in the case were all regular and in conformity to law.

Sixth. Counsel for appellant in his brief says that this cause should be reversed "because the court erred in overruling the motion for a new trial." Counsel did not attempt to point out the error of the court complained of in the motion for new trial or show how appellant was injured thereby. On the contrary, he has assumed the proposition in controversy and has substituted assertion for evidence and argument. This court would thereby be at liberty in an ordinary case to entirely disregard this contention, but, on account of the gravity of this case, we have carefully examined the motion for a new trial to see if we could find any error therein complained of which would warrant this court in setting aside the verdict and judgment. We find that the motion for a new trial is merely a formal one, and the only specific errors of which it complains are that the verdict

is contrary to the law and the evidence. There is also a general complaint that the court erred in its instructions to the jury, and we are of the opinion that the court did err in charging the jury on the law of self-defense and in submitting the issues of manslaughter in the first and second degrees. The state's evidence makes out a case of deliberate and premeditated assassination. The testimony of appellant makes out a case of mutual combat provoked by himself when armed with a deadly weapon, intending that it should result in the death or serious bodily injury of himself or deceased. Under his own testimony he could not invoke the law of self-defense. Neither do the circumstances proved mitigate the offense from murder to manslaughter in either degree; but these errors of the court were in favor of, and not against, appellant, and therefore he could not have possibly been injured thereby.

We have read all the instructions of the court and analyzed them carefully, both by paragraphs and also in connection with each other, and we fail to find a single paragraph which is in the least calculated to influence the jury adversely to the rights of appellant. The trial of the case from beginning to end was eminently fair, and in no instance was appellant deprived of a single substantial right. We cannot say that the verdict of the jury is contrary to the law. Neither can we say that the verdict is contrary to the evidence. It was proved that appellant had repeatedly threatened to kill the deceased, growing out of a controversy between them with reference to a debt of 60 cents alleged by appellant to be due him from deceased, but which deceased denied. Appellant had said that he would either get his 60 cents or get deceased. This controversy was intensified by jealousy between the parties on account of Lucy Carrington. With reference to this matter, appellant had said, "The crazy son of a bitch is after my woman," and had stated that if he ever caught deceased at the Carrington Hotel again he would kill him. Here again we have proof of our statement that illicit love is a most prolific source of crime and assassination among men. For a full discussion of this question, see *Burns v. State,* 8 Okla. Cr. 554, 129 Pac. 657. It was proved that deceased went to

the Carrington Hotel, which was a public house, on the day of the homicide, after his clothes, which he had left there to be washed by Lucy Carrington, and that deceased was unarmed at the time. It was proved that a few days before the homicide appellant purchased a pistol, and at the time of the difficulty he was going to the pump to get some water with his pistol in his pocket; that he came upon deceased at the back porch, and asked deceased what he was doing there. Deceased replied that he had come after his clothes. Appellant said, "I told you to keep away from here," and, pulling his pistol, rushed upon and shot an unarmed man. Appellant then fled to the river bottom, and could not be found by officers until 8 o'clock that night, when he was arrested by a deputy sheriff. Appellant offered no explanation of his attempted flight. The jury could not believe that it arose from any cause other than conscious guilt. Here we find every element of murder, deliberately committed in a cowardly manner. In fact, the jury could not have reasonably arrived at any other conclusion.

Seventh. It is true that this court possesses the power of modifying a judgment and reducing the punishment of death to imprisonment for life. See *Fritz v. State,* 8 Okla. Cr. 342, 128 Pac. 170; but this power, like the power to pardon, parole, or commute sentences, cannot be arbitrarily exercised by any official of Oklahoma. No lawyer of respectable intelligence and learning, and who regards his reputation as such, will assert that either of these powers can be lawfully exercised, except for special reasons, which may arise in an individual case, or that they can be arbitrarily used so as to operate as a wholesale suspension or repeal of any law or provision of law. As a great misapprehension exists as to the right to commute the death penalty, and as this misapprehension has done infinite harm to the administration of law in Oklahoma, and as this is a death penalty case, it is imperatively necessary for this court, which alone has the right to finally construe the law and the Constitution in criminal cases, to declare the true meaning and scope of the right to commute the sentences of the courts. Courts are required by law to take judicial notice of any facts affecting a question pending before

them which are of such general and public notoriety that every one will be fairly presumed to be acquainted with them. See *Hunter v. N. Y. O. W. R. Co.,* 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246. The Supreme Court of the United States, in the case of *Brown v. Piper,* 91 U. S. 37, 23 L. Ed. 200, said: "Facts of universal notoriety need not be proved." In *Wynehamer v. People,* 13 N. Y. 378, the Supreme Court of that state said: "We must be allowed to know what is known by all persons of common intelligence." To the same effect, see *Town of North Hemp-stead v. Gregory,* 53 App. Div. 350, 65 N. Y. Supp. 867. The courts also hold that judicial notice takes the place of proof, and is superior to evidence. See *State v. Main,* 69 Conn. 123, 37 Atl. 80, 36 L. R. A. 623, 61 Am. St. Rep. 30; *Brown v. Piper,* 91 U. S. 37, 23 L. Ed. 200; *State v. Morris,* 47 Conn. 179; *Commonwealth v. Margynski,* 149 Mass. 68, 21 N. E. 228.

It is a matter known to all persons of common intelligence in the state of Oklahoma that the Governor takes the position that legal executions are judicial murder; and that he refuses to permit them to be carried into effect, upon the ground that he would thereby become a party thereto; and that he has expressed his fixed determination to strictly adhere to this policy until the expiration of his term of office. As this is a capital conviction, and as the Governor's action presents an absolute bar to the enforcement of the law in Oklahoma, we cannot, without a failure to discharge our duty, omit to take judicial notice of, and pass upon, this position of the Governor, as unpleasant as it is for us to do so. If we remained silent, the Governor and the people would have the right to think that the courts acquiesced in the position which he has assumed, when as a matter of fact nothing is further from the truth. We therefore cannot avoid deciding this matter.

That the position of the Governor is utterly untenable is shown by the following considerations:

First. There is no provision of law in Oklahoma which requires the Governor to approve a verdict assessing the death penalty before it can be executed. His duty with reference to such verdicts is negative and not affirmative. He has nothing

whatever to do with them, unless he may be satisfied that an injustice has been done in an individual case; then he may commute the sentence or pardon the offender; but this can only be done upon the ground that, upon the facts presented, the defendant was a fit subject for executive clemency, and that an exception should be made in his favor as against the general rule of law.

Second. It is not true that when a defendant is executed according to law the Governor is in any wise responsible therefor. The execution takes place in obedience to law and not because the Governor orders it; and the Governor has not a shadow of legal or moral right to interfere with the law, unless he can say upon his official oath that special reasons, applicable alone to the given case before him, justify such action. The Governor's alleged conscientious scruples with reference to the infliction of capital punishment cannot lawfully justify his action in a wholesale commutation of death penalties. The Governor has no legislative powers at all; he can neither enact nor repeal laws, either directly or indirectly, which he does attempt to do when he sets aside the death penalty in all murder cases. The law recognizes the fact that some good men are honestly opposed to the infliction of capital punishment, but it prohibits such persons from passing upon this question. Paragraph 8, sec. 5859, Rev. Laws 1910, is as follows:

"If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty, in which case he shall neither be permitted nor compelled to serve as a juror."

This provision of law precludes the Governor from commuting a death penalty, in a single case, upon the ground of his alleged conscientious scruples. So it is seen that he is not only not compelled to approve such a verdict, but that he is positively forbidden by law to allow his scruples to influence him in the least in his action. It would indeed be an idle thing for the Legislature to enact a law and then make its execution depend upon the whim or caprice of any juror or Governor. If the Governor's position is correct, then we do not have a government of law in Oklahoma, but a government of men only. If it were

necessary for the Governor to approve such verdicts before they could be carried into execution, then the Governor should have made his views known before he was elected, and he should have refused to take the oath of office. There is no logical escape from this conclusion. The Governor's position can only be explained upon the hypothesis that he imagines himself to be a dictator, and that his will is supreme and above the law. In this the Governor is mistaken.

Third. During the last campaign for the election of the present Legislature, which occurred after the Governor had served two years of his four years' term, he took an active part in the campaign and personally appealed to the people to elect a Legislature who would support what he called "my policies." In that campaign he also made a vicious assault upon this court, which has inflexibly demanded the strict enforcement of all of the laws of Oklahoma. His position on the subject of capital punishment was then well known to all of the people of Oklahoma. His action in commuting the death penalties of a number of atrocious murderers had caused a great wave of indignation to pass over the entire state. The issue was clearly drawn; and the advocates of, and those who objected to, the death penalty, debated the question as to whether or not capital punishment should be repealed. In fact, this was probably the most discussed question in the state. The Governor personally took part in a number of these debates. This is a matter of public history of which this court must take judicial notice. The election passed off, and the policies of the Governor were not indorsed by the people in the election of the members of the Legislature; on the contrary, a Legislature was elected which was hostile to the policies of the Governor, and which refused to repeal the law of capital punishment. If he desires to prove that he regards himself as a servant of the people, he should now no longer interfere with the execution of their will, or he should resign from his office.

Fourth. If it be conceded that the Governor's position is correct, and that he has the right to suspend the execution of any provision of law of which he may not approve; and if it be

true that the other officials of the state are answerable to him, and not to the people—then we have an empire in Oklahoma, and not a free state. This would establish a precedent which would justify any subsequent Governor, who might be opposed to the prohibitory liquor law, in commuting all jail or penitentiary sentences inflicted in such cases upon the ground that he did not like the law, and that he knew better than the people what should be done in such cases. The same principle would apply to all laws. Concede the principle contended for by the Governor, and where will the matter end? It would utterly demoralize the enforcement of law in Oklahoma, and would convert the state government into one of men and not of law. What do the people of Oklahoma think of this?

A careful investigation of the authorities on this question has failed to disclose a single law writer who has ever in the least sustained the position of the Governor. Mr. Bishop, one of the greatest writers of law that America has produced, says:

"Alike under our national Constitution and the Constitutions of the several states, either by express words or by construction, the government is divided into three separate branches—the executive, the legislative, and the judicial—and no one branch is permitted to discharge the functions of another. If the executive power cannot repeal laws directly, so neither has it any just right to undertake indirect repeals by pardon (commutation or parole). With us, a pardon (commutation or parole) is properly grantable only for some special cause arising out of the particular instance. But, if whenever there is an unavoidable and honest mistake it is the legislative will that the victim of the mistake shall be punished, the Governor has no right to open a pardon shop to frustrate this will. It is an attempt to repeal so much of the law, and the power of repeal is with the Legislature. * * * Of practical importance—not exceeded by any of the ordinary expositions in law books, are some questions heretofore neglected by legal authors, relating to the principles which should guide the executive power in granting and withholding pardons (commutations or paroles).

"Public Motives, Not Private.—No official person, whatever his station or the nature of his office, is justified in performing any official acts from private motives, or in pursuance of mere private views. An executive officer, asked to grant a pardon (commutation or parole) should neither comply nor refuse mere-

ly because he would personally be pleased to see the prisoner suffer or to see him go free. He should act upon public consideration. For example:

"Appeal from Legislature.—He does not sit as a court of appeal from the Legislature. If he believes the law under which a prisoner is suffering to be unwise or unjust, still this opinion cannot properly incline him to grant the pardon (commutation or parole), because the power which makes and unmakes laws is not in him, and officially he is required to look upon the law as just and wise, however his private opinion may revolt. * * *.

"Proceed by Rule.—The pardoning officer, therefore, should proceed by rule, as do the judges in the performance of judicial acts. Technically, the power of pardon (commutation or parole) is termed discretionary; so are a large part of the powers of courts. With a court, for instance, it is discretionary whether to try a cause when it is reached on the calendar, or to continue it. Yet this discretion should be exercised on public considerations, and according to rule, not from mere private impulses or views. And a judge who should continue causes or bring them on for trial as personal motives impelled, to the injury of suitors, would commit thereby a high misdemeanor in office, for which he ought to be impeached. And the same would follow if the President or a Governor should act thus on private views in granting or withholding pardons (commutations or paroles).

"Practical Restraint—(Impeachment).—In popular writings, we often meet with injuriously false views on this subject. Nothing can be more pernicious than the opinion, sometimes afloat, which assigns to the President or Governor the authority to pardon (commute or parole) without limit, and denies to the impeaching power the right to interfere. The granting of pardons (commutations or paroles) is discretionary in its nature; therefore it is necessarily the more open to control by the impeaching power. If it comes to be understood that a single man, intrusted with the high function of pardon (commutation and parole), can open all the prisons of the country and let every guilty person go free, thus at a blow striking down the law itself, and not be himself punished for the high misdemeanor, the most disastrous consequences to liberty and law will sooner or later follow. Such a conclusion is itself the annihilation of law, and only upon law can liberty repose."

See Bishop's New Criminal Law, vol. 1, pp. 117, 178, 179, 180, 181, 559, 561.

Mr. Bishop cites authorities supporting this text, but it is so manifestly just, and as this opinion is already quite lengthy, we will not consume unnecessary time with further quotations.

The law of Oklahoma prescribes the penalty of death for willful murder. This punishment, like most of our penal laws, was taken by the Legislature from the divine law. In the thirty-fifth chapter of the Book of Numbers, the Bible says:

"Moreover ye shall take no satisfaction for the life of a murderer, which is guilty of death: but he shall be surely put to death. And ye shall take no satisfaction from him that is fled to the city of his refuge, that he should come again to dwell in the land, until the death of the priest.

"So ye shall not pollute the land wherein ye are: for blood defileth the land: and the land cannot be cleansed of the blood that is shed therein, but by the blood of him that shed it.

"Defile not therefore the land which ye shall inhabit, wherein I dwell: for I the Lord dwell among the children of Israel."

We are also told in the nineteenth chapter of Deuteronomy:

"That innocent blood be not shed in thy land, which the Lord thy God giveth thee for an inheritance, and so blood be upon thee.

"But if any man hate his neighbor, and lie in wait for him, and rise up against him, and smite him mortally that he die, and fleeth into one of these cities:

"Then the elders of his city shall send and fetch him thence, and deliver him into the hand of the avenger of blood, that he may die.

"Thine eye shall not pity him, but thou shalt put away the guilt of innocent blood from Israel, that it may go well with thee."

Many other passages of Scripture can be quoted to the same effect, for the Bible is absolutely unanimous in its statements that the legal punishment for willful murder shall be death.

Statistics show that in England, where capital punishment for murder is rigidly inflicted, within the last 25 years the volume of crime has decreased 50 per cent.; while in America, where capital punishment is rarely inflicted, the volume of crime has increased over 50 per cent. in the last 25 years. This shows that those persons who so bitterly denounce capital punishment are not infallible in their views, notwithstanding their assump-

tion of superior intelligence and virtue; but we will not discuss the wisdom and justice of capital punishment. This is a question for the people or the Legislature alone. The supreme question is: Shall the laws of Oklahoma be enforced? One of the most mischievous tendencies of the present day is a disposition manifested among the people to set their individual judgments up against the law, and to assert their right not to obey any law unless it meets with their personal approval. This is anarchy, pure and simple. It is bad enough for private citizens to feel and act this way, but it is much more criminal for officials to do so, and the higher the official the greater the crime committed. All state officials have taken an oath to support the laws of the state. No Governor has the right to say, directly or substantially, either by words or by actions, which speak louder than words:

"I think that capital punishment is wrong. I know that it is taught in the Bible, and is provided for in the laws of Oklahoma; but I occupy a higher plane than this. I am not such a barbarian as to believe this is right. I am a better judge of what punishment should be inflicted than is taught in the Bible, or than the ignorant, savage, and bloodthirsty people of Oklahoma have provided for in their laws. Therefore, notwithstanding my official oath, I will place my judgment above the law, both human and divine, and make my will supreme in this state, and will not permit capital punishment to be inflicted in Oklahoma, no matter what the law is, or how atrocious the offense committed may have been. All officials are only my personal servants and it is their duty to execute my orders, and not stop and inquire as to what the law is. The courts must recognize and bow to me as their master, and accept and follow my will as the supreme law; and if they dare to question my absolute right to do as I please about anything I will publicly brand such judges as fools and crooks, and charge that they have entered into a conspiracy with criminals and that they are using the law as a cloak to protect crime."

Nothing could more impair the reputation of the state, nothing could be more demoralizing to respect for law, or more highly calculated to incite mob violence, than such conduct as this. We are taught in the Bible that:

"Because sentence against an evil work is not executed speedily therefore the heart of the sons of men is fully set in them to do evil." (Ecclesiastes viii, 11.)

Some say that these passages of Scripture are obsolete, and are not applicable to the present age of moral enlightenment and civilization; but many occurrences have taken place in Oklahoma in recent years which prove that these teachings of the Bible, like all other divine laws, are just as true and as applicable to the people of this day as they were in ancient times. We very much fear that, if some assurance is not given to the people of Oklahoma that sentences will be executed in the future, matters will go from bad to worse. If officials place their individual views above and defy the law, how can they expect that the people will respect and obey the law? It is the duty of officials to set an example of obedience to law. If officials do not obey the law, can they blame the people for taking the law into their own hands? This court will not render a single opinion which can be used in excuse for mob violence. It will to the last extremity defend the exclusive right of the people to enact laws, and continue to demand, as it has uniformly done since the day of its organization, the strict enforcement of all of the laws of the state as enacted by the people or the Legislature, it matters not whose criticism and enmity it may incur thereby, or what amount of misrepresentation, abuse, and villification may be heaped upon it therefor. The members of this court would be fools, cowards, and traitors if they took any other position.

This is the second time that this cause has been before this court on appeal. See 6 Okla. Cr. 430, 119 Pac. 278. On the first appeal the conviction was reversed for errors of law. We then stated that if the evidence for the prosecution was true it made out a case of murder; but we were of the opinion that sufficient latitude had not been granted appellant in the cross-examination of the witness Lucy Carrington, and we felt that it was possible that, had the proper latitude been granted on cross-examination, facts might have been developed which would so impair and destroy her testimony as to have warranted the jury in finding appellant guilty of manslaughter; but, upon the second trial of this

cause, the said Lucy Carrington was subjected to the most searching cross-examination, and no fact was developed which in the least shook her testimony or impaired its credit. On the contrary, the answers given by this ignorant negro woman to every question asked leads us now to believe that her entire testimony was the truth; and the evidence, taken as a whole, is much more satisfactory as to the guilt of appellant than it was upon the former trial. In both trials the jury found the appellant guilty of murder, and in each instance assessed his punishment at death. There was nothing in either record which indicated that the jury were prejudiced against appellant or that they were ignorant, bloodthirsty barbarians. On the contrary, they were representative citizens of Oklahoma, and men of intelligence, fairness, and integrity. Each one was voluntarily selected by appellant, they saw the witnesses, and heard the testimony. We feel that we should respect their judgment, and should not disturb it except for just cause, and that the evidence makes out a case of murder. The law prescribes the death penalty in such cases, at the discretion of the jury. There is nothing in the record which even intimates that the jury were influenced by passion or prejudice in assessing the death penalty, or that any mistake was made in their doing so. Under these circumstances, no official of Oklahoma has the lawful right to interfere with the execution of their verdict.

As there is no legal reason why this case should be reversed or modified, we have no discretion but to affirm the judgment of the lower court.

The appeal in this case having prevented the execution of appellant at the time set in the original sentence, the judge of the superior court of Oklahoma county is directed to resentence appellant according to section 5979, Rev. Laws 1910, and also in accordance with the provisions of the act of March 29, 1913, on page 206 of the Session Laws of Oklahoma, 1913. It is true that the latter law provides that the punishment of death must be inflicted in the state penitentiary by electrocution, and was passed subsequent to the commission of the offense; but this is not an *ex post facto* law, so far as appellant is concerned, because under the provisions of article 5981, Rev. Laws 1910,

which was in force when the offense was committed, the death penalty could be inflicted either by hanging or by electrocution, at the discretion of the court before whom the case was tried. Now it must be by electrocution, and the sentence of the court must be in conformity to the provisions of the act of 1913, hereinbefore referred to.

We find no error in the record, and the judgment of the superior court is in all things affirmed, and the court is directed to take steps at once to have its sentence carried into execution as directed by law.

ARMSTRONG, P. J., and DOYLE, J., concur.